Argued Feb. 14, decided Feb. 27, adhered to on rehearing July 30, 1912.

# STEVENS *v.* MYERS.*

[121 Pac. 434: 126 Pac. 29.]

WILLS—TESTAMENTARY CAPACITY—INSANITY.

1. Not every degree of insanity of a testator will vitiate a will, and though he be enfeebled, physically and mentally, if he can understand, at the time of the execution of the will, what he is doing, has a knowledge of his property, and how and to whom he wishes to dispose of it, and remembers those who have claims on his bounty, he is of sufficient testamentary capacity.

WILLS—TESTAMENTARY CAPACITY—"DELUSION."

2. A delusion of a testator which will render him of insufficient testamentary capacity to execute a will must be the spontaneous product of the subjective processes of a disordered intellect, inducing a belief without any support in extrinsic evidence; and a mere error in judgment upon proven or admitted facts does not constitute a "delusion," however much it may be at variance with the conclusion reached by unprejudiced minds from the same facts.

WILLS—TESTAMENTARY CAPACITY.

3. In an action to contest a will, evidence *held* sufficient to render beliefs of the testator, in regard to the effect of medical treatment of a doctor upon his wife, and as to his relations with his wife and daughter, conclusions, rather than delusions.

WILLS—TESTAMENTARY CAPACITY.

4. In an action to contest a will, evidence *held* to show that at the time of the making of the will testator had sufficient testamentary capacity to make it.

WILLS—TESTAMENTARY CAPACITY—SUFFICIENCY AT TIME OF CODICIL.

5. Although a testator may not have been of sound and disposing mind and memory, or may have been laboring under a delusion at the time he made a will, a subsequent codicil, which did not disturb any bequest, but merely gave directions as to how a portion of the estate bequeathed should be distributed in case the devisee predeceased the testator, amounts to a republication of the will; and the sufficient testamentary capacity of the testator, at that time would free the entire will from any taint which it may have received at the time of its making.

## ON REHEARING.

JURY—RIGHT TO TRIAL BY JURY—CONSTITUTIONAL AND STATUTORY PRO
VISIONS.

6. The act respecting wills of September 26, 1849 (Laws 1850-51, p. 274), provided that any person interested in the probate of a will might appear within five years after its probate and by petition to the

---

*All the authorities on the question "what is testamentary capacity" are reviewed in an elaborate note in 27 L. R. A. (N. S.) 2.    REPORTER.

district court contest its validity, the issue to be tried by jury. By
section 8 of an act establishing a probate court, effective May 31, 1853,
original jurisdiction of the probate of wills was given to the judge of
probate, Section 23 provided that any person aggrieved might appeal to
the district court; and section 30 provided that that court, at its discre-
tion, might cause any question of fact to be tried by a jury. On
December 15. 1853, the provisions of these two acts were re-enacted.
Article I, Section 17, Constitution of Oregon, provides that in all civil
cases the right of trial by jury should remain inviolate. Article XVIII,
Section 7, continued, until altered or repealed, all territorial laws then
in force not inconsistent with the constitution. *Held,* conceding that the
act of December 15, 1853, was valid, and that the right of trial by jury
thereunder was continued by the constitution, such right only exists in
an original proceeding commenced in the circuit court as the successor
of the territorial district court, and is not demandable as of right in
proceedings commenced in the county court and appealed to the circuit
court.

COURTS—PROBATE JURISDICTION—CONSTITUTIONAL AND STATUTORY PRO-
    VISIONS.
    7. The act of December 15, 1853, so far as it conferred authority on
district courts to take probate of wills, was void as conferring on that
court jurisdiction not given by the act of Congress of August 14, 1848,
c. 177, Stat. 323, establishing the territorial government of Oregon,
section 9 of which created district and probate courts, invested the district
courts with the same jurisdiction exercised by circuit and district courts
of the United States, and which act also provided that any territorial
laws inconsistent therewith should be null and void.

COURTS—PROBATE JURISDICTION—CONSTITUTIONAL AND STATUTORY PRO-
    VISIONS.
    8. If the act of December 15, 1853, was valid, it was an expansion
of the common-law rule regarding trial by jury, and could be repealed,
in view of Article XVIII, Section 7, Constitution of Oregon, continuing
territorial laws in force until repealed, and was so repealed by. Section 936
L. O. L., granting exclusive jurisdiction to the county court to take
proof of wills, and section 1135, providing that such jurisdiction should
be exercised in the same manner as in suits in equity.

WILLS—COURTS INVESTED WITH PROBATE JURISDICTION.
    9. The county court has exclusive and superior jurisdiction in probate
of wills.

JURY—RIGHT TO TRIAL BY JURY—CONSTITUTIONAL PROVISIONS—"CIVIL
    CASES."
    10. Probate proceedings are not "civil cases," within Article I, Sec-
tion 17, Constitution of Oregon, providing that the right of trial by jury
in all civil cases shall remain inviolate, especially in view of Article VII,
Section 12, relative to the jurisdiction of county courts, expressly recog-
nizing a dstinction between probate jurisdiction and civil jurisdiction.

WILLS—PROBATE PROCEEDINGS—STATUTORY PROVISIONS.
    11. Section 1135, L. O. L., providing that the mode of proceeding in
probate matters shall be the same as in suits in equity, applies to pro-

ceedings to set aside a probate, as well as the proof of a will in common
form. the object of the proceeding in either case being the proof of
the will.

From Multnomah: EARL C. BRONAUGH, Judge.

Statement by MR. JUSTICE BURNETT.

This is a proceeding by Georgia Frances Stevens
against George Tobias Myers, Jr., to contest a certain
instrument purporting to be the last will and testament
and the codicil thereto of George T. Myers.   The facts
are as follows:

On July 22, 1907, upon the petition of the defendant
here, the county court of Multnomah County, Oregon,
admitted to probate, in common form, a paper, purport-
ing to be the last will and testament of George T. Myers,
and a codicil annexed thereto, and directed that letters
testamentary issue to the defendant upon his taking
and filing the oath required by the statute.   The will
itself was dated May 31, 1902, and, in substance, devised
to the plaintiff, Georgia Frances Stevens, daughter of
the decedent, the sum of $20,000, to be paid to her when
she should arrive at the age of 45 years.   The remainder
of the estate was devised to the defendant, his son, who
was nominated executor of the will, to serve without any
bond or undertaking.   By the codicil, dated December 3,
1902, it was provided that, in case the son should die
before the death of the testator, the portion of the estate
bequeathed to him should be distributed in a certain man-
ner therein specified, but not now important for the
decision of this case, because the testator died before the
defendant.

On December 19, 1907, the plaintiff filed her petition
and complaint in the county court, reciting the order
admitting the alleged will to probate, and, as appeared,
in substance, in the original petition for the probate of
the will, she alleged that the testator, George T. Myers,
died in Seattle, Washington, July 12, 1907, being at the

time of his death a resident and inhabitant of Multnomah County, Oregon, leaving an estate therein, and that at the death of said George T. Myers he left surviving him two children, who were and are his only heirs at law, viz., Georgia Frances Stevens, the plaintiff, and George T. Myers, Jr., the defendant.

The complaint then alleges:

"That said will is not now and never was the last will and testament of the said George T. Myers, deceased; that at the time of the signing of said writing by the said George T. Myers, and for some time prior to the execution of the pretended will, the said George T. Myers was not of sound and disposing mind or memory, and that during all of said time that George T. Myers labored under the insane delusion that his wife, who died a natural death in January of the year 1902, had been foully murdered, and that your petitioner, the daughter of the said George T. Myers, had in some manner given aid and comfort to those whom he, the said George T. Myers, insanely imagined to be the persons who had murdered his wife; that it was not true that the wife of the said George T. Myers had been murdered, nor was it true that your petitioner had given any aid or comfort to those who, the said George T. Myers imagined, had committed the crime of murder upon his wife, but such extravagances had no existence whatever, except in the diseased and morbid condition of the mind of him, the said George T. Myers, yet such insane delusion so far had control of him, the said George T. Myers, that it was impossible to reason him out of such conceptions, and that in whatever he did with reference to your petitioner the said George T. Myers was governed and guided by said delusions."

The allegation quoted was denied by the reply. At the hearing, after the testimony had been taken, on motion of the plaintiff, her complaint was amended, so as to add to the allegation concerning the delusion, said to have been suffered by the testator, these words, "and that your petitioner was criminally intimate with one

Dr. Samuel A. Robinson," and further to her disavowal, the words, "nor was she criminally intimate with the said Dr. Samuel A. Robinson, nor with any one," and it was ordered that these new allegations be considered as denied by the defendant and proponent. On October 24, 1908, the county court entered an order and decree to the effect that the order admitting the writing to probate as a last will and testament of the decedent should be set aside and held for naught. On appeal to the circuit court of Multnomah County, the decision of the county court was affirmed June 13, 1910. The defendant and proponent appeals.

REVERSED: ADHERED TO ON REHEARING.

For appellant there was a brief over the names of *Messrs. Dolph, Mallory, Simon & Gearin* and *Mr. Martin L. Pipes,* with oral arguments by *Mr. Joseph Simon* and *Mr. Pipes.*

For respondent there was a brief over the names of *Mr. Henry E. McGinn, Mr. Henry H. Northup,* and *Mr. Charles W. Fulton,* with oral arguments by *Mr. Northup* and *Mr. Fulton.*

MR. JUSTICE BURNETT delivered the opinion of the court.

The general charge is that the decedent lacked testamentary capacity, and the specification is that he labored under an insane delusion. At the hearing, no effort was made to establish a general insanity of the testator. The principal endeavor of both parties was to establish or overturn the averment of delusion already mentioned.

Sallie S. Myers, wife of the decedent, was born October 21, 1845, and died January 12, 1902. The testator himself, George T. Myers, was born October 30, 1836, and died July 12, 1907. The will in question was made May 31, 1902, and the codicil December 3, 1902. The testator lived five and one-half years after his wife, and almost

that long after making his will, and, as disclosed by the testimony, was engaged in active business, managing large affairs almost to the very date of his death. The allegation of the complaint, to the effect that his estate was of the probable value of $300,000, is not contested by any evidence. It is abundantly established by the testimony that the testator was devotedly fond of his wife; that for a period of nearly 40 years they lived together happily as man and wife; and that he relied upon her, not only to manage her household, but also to advise him in almost every business transaction. He was addicted to the use of intoxicating liquors, and became, as stated by one witness, a "seasoned drinker." It does not appear that he was ever so drunk but what he could walk and attend to business. They had but two children, the parties to this suit. He was very fond of the contestant, educated her at considerable expense, and, both before and after her marriage, sent her east for medical treatment, paying the expenses of her journey in every instance. When she married, he gave her $5,000 with which to furnish her residence. He afterwards bought a large dwelling house in Portland, and allowed her and her husband to occupy it until April 1, 1902, when he began to charge rent at the rate of $60 per month, as will be hereafter noticed. In February, 1896, the testator and his wife each made a will, bequeathing to the other all the property owned by the testator in those wills, with provisos that in case of the death of the other spouse before the death of the testator all the property should descend in equal shares to the two children. Except for the transposition of the testator and beneficiary, the two wills were identical in terms. Under her will, therefore, the property of Mrs. Myers passed to her husband at her death.

In 1882, the contestant, then a schoolgirl about 17 years of age, was threatened with some pulmonary trouble. For

the benefit of her health, her father sent her east to visit relatives, who took her to consult the Dr. S. A. Robinson, mentioned in the pleadings, who was then practicing at some place on Staten Island, N. Y. She secured board near his residence, took his treatment for several months, and then returned to Portland, Oregon. She went again for treatment in 1886, and this time took up her abode in the doctor's household, again remaining under his care for several months. This led to correspondence between the doctor and the contestant's parents. They finally went east themselves in 1887, became personally acquainted with Robinson, and visited at his house. In 1893 the contestant was visiting in New York in company with her parents, and again met Robinson. Later on he visited the contestant's parents, and also visited at her home in Portland. Robinson had been divorced from his wife for many years, and before the marriage of the contestant he and his parents maintained a household near New York City; but after the death of his mother he removed to Tacoma Park, a suburb of the city of Washington, where he kept up a domestic establishment of his own. His son then lived in Baltimore, but, with his wife, was part of the time at the physician's home in Tacoma Park, and besides that Robinson's man and the same people that had been in the home when the contestant's parents were visiting were in the Tacoma Park household. In 1899 the plaintiff again visited Robinson and family at Tacoma Park, and remained there until some time in July, 1900. During her stay there, she visited Washington and various other places with Robinson, all, of course, with the knowledge of her husband and her parents. Robinson removed to Portland, Oregon, in 1900, coming there in company with the contestant on her return. He immediately installed his household furniture and library in the home of the contestant, and continued to reside with her and her husband until some time after the death of her mother.

He made, at his own expense, sundry changes in the house bought by the decedent for the use of contestant and her husband, and shared with them the expense of housekeeping there. The decedent took great pains to introduce Robinson to various leading men with whom he was acquainted, and spoke very highly of him and his attainments as a physician. The family, especially the contestant and her mother, showed him great attention.

In the early part of July, 1901, the decedent and his wife, together with the contestant and Robinson, went to Astoria on an excursion on the steamer Potter. Returning by train late at night, the contestant's mother, in alighting from the train, fell, and in some way injured herself. Later in that month, the mother complained of a pain in her left side, took to her bed, and sent for Robinson to treat her. He diagnosed her ailment as malaria and sciatica, and treated her accordingly. She did not improve in health, but continued to decline. It is in testimony that the decedent implored his wife to call other physicians in consultation; but she steadfastly refused, and would have no medical counsel, except from Robinson. After treating her for some time, the latter advised that she be taken to a drier climate, or to some health resort. All this time the decedent was engaged with his son in business in Seattle, as salmon packers. As partners, they continued in this business, and in like ventures in Alaska, until the decedent's death. When the question of change of scene or climate for the decedent's wife arose, he suggested Green River Hot Springs in Washington; but Robinson objected to this, saying to Myers that the mountains would be better for a fever patient. It is in testimony, however, that he said to a witness, Mrs. Prentiss, that he wanted to take her as far away from Seattle as he could; for he did not want Mr. Myers to come so often, and the farther he got her away the better. This same witness testified that on his return from Ashland

on one occasion the decedent complained to her that she herself was to blame for sending Mrs. Myers to Southern Oregon, and she then told him of the statement of Robinson, already mentioned.

It was finally determined to take Mrs. Myers to Ashland, whither she went about the middle of September; Robinson and the contestant both acompanying her, and both remaining there until her return to Portland some time during the latter part of 1901 or early in 1902. Robinson was in constant attendance upon her during her stay at Ashland, living in the same house. At length an enlargement developed in her left side, about two inches below the umbilicus and about six inches to the left of the median line, which he at first diagnosed as hernia. Some time after this, the swelling was discovered to be an abscess, and on October 25, 1901, with the aid of other physicians, an operation was performed, by lancing the abscess. From the aperture thus made, pus spurted out, until about a quart was discharged. After this, the patient improved perceptibly, and began to talk of returning to Portland for the purpose of setting her house in order and preparing her wardrobe for a trip to California. Robinson advised strongly against her going back to the damper climate of Portland, as did the other physicians in attendance; but she persisted in her purpose and went to Portland, accompanied by Robinson and her daughter. About January 7, 1902, the patient was taken suddenly with a severe chill, and Robinson was called to attend her. He demanded that a consulting physician be called, and Dr. Rockey was summoned. Notwithstanding the treatment they gave her, she continued to decline, and died on January 12, 1902; the immediate cause of her demise, according to her death certificate, being acute nephritis with contributory peritonitis. Robinson was invited by Mr. Myers to attend the incineration of the body, and afterwards, at his request, gathered the ashes from the

crematory.  At first Myers, although distressed over the
death of his wife, accepted the situation without com-
plaint; but afterwards developed a state of great bitter-
ness towards Robinson, and denounced him in unmeas-
ured terms to almost any one who would talk with him
on the subject, claiming that the physician was so ignor-
ant of the true nature of the case that his wife died on
account thereof.  He complained, also, that Robinson had
undue influence over his wife and daughter; that his
daughter had sided with Robinson as against him in the
estrangement which grew up between himself and the
physician, and blamed her severely for that attitude.  This
is a general summary of the situation up to a few weeks
after the death of Mrs. Myers.

1. The contention for the contestant is that the
testator, her father, was suffering from insanity, mani-
fested by a delusion that her mother had been murdered,
and that she had in some way given aid and comfort to
the murderer; but whether before or after the fact is not
stated.   In the language of *Ames* v. *Ames,* 40 Or. 495,
504 (67 Pac. 737, 741), "the rule is settled in this State
that if a testator, at the time he executes his will, under-
stands the business in which he is engaged, and has a
knowledge of his property, and how he wishes to dispose
of it among those entitled to his bounty, he possesses suffi-
cient testamentary capacity." *Chrisman* v. *Chrisman,* 16
Or. 127 (18 Pac. 6) ; *Potter* v. *Jones,* 20 Or. 239 (25 Pac.
769: 12 L. R. A. 161) ; *Clark* v. *Ellis,* 9 Or. 128; *Cline's
Will,* 24 Or. 175 (33 Pac. 542: 41 Am. St. Rep. 851).
It is not every degree of insanity which will vitiate the
will of a testator in question.  Indeed, there is no standard
like that of weight or dimension, by which we can meas-
ure the mental capacity of any one.   Hence it is that,
although a testator may be enfeebled, both physically and
mentally, yet, if he retains sufficient mind, reason, and
judgment to understand at the time that he executes his

will that he is engaged in that kind of business, that he has a knowledge of his property and how he wishes to dispose of it, and remembers those who have natural claims upon his bounty, he is of testamentary capacity.

2. Delusions have been variously defined; but in the case of *Potter* v. *Jones,* 20 Or. 239 (25 Pac. 769: 12 L. R. A. 161), it is said:

"Delusions are conceptions that originate spontaneously in the mind without evidence of any kind to support them, and can be accounted for on no reasonable hypothesis. The mind that is so disordered imagines something to exist, or imputes the existence of an offense, which no rational person would believe to exist or to have been committed without some kind of evidence to support it."

It may also be said that a delusion is the spontaneous product of the subjective processes of a disordered intellect, inducing a belief without any support in extrinsic evidence. On the other hand, if the element of spontaniety is not present, and there be any extraneous reason, however slight, inducing the conviction in question, and to which a deliberative mind would give attention, there is no delusion. A mere error in judgment upon proven or admitted facts does not constitute a delusion, however much it may be at variance with the conclusion reached by unprejudiced minds from the same facts.

"In analyzing the legal conception of an insane delusion, it is necessary to keep in mind that the ultimate and essential thing to be established is that the testator had, at the time the will or instrument was executed, such an aberration as indicates an unsound or deranged condition of the mental faculties, as distinguished from the mere belief in the existence or nonexistence of certain supposed facts, based upon some sort of evidence. A belief which results from a process of reasoning from evidence, however imperfect the process may be or illogical the conclusion, is not an insane delusion. If, under the facts shown, the court is able to see how a rational person might have believed all that the testator

believed, and still be in the possession of all his senses, an insane delusion is not established. Where a testator has some actual grounds for the belief which he has, though regarded by others as wholly insufficient, the mere misapprehension of the facts, or unreasonable or extravagant conclusions drawn therefrom, do not establish the existence of such a delusion as will invalidate his will." *Snell* v. *Weldon,* 243 Ill. 496, 520 (90 N. E. 1061, 1070).

"There is no such thing as a delusion founded upon facts. It is a mental conception, in the absence of facts. If the idea entertained has for. a basis anything substantial, it is not a delusion. There may be a misjudgement of facts, or there may be an accentuated opinion, founded upon insufficient facts, but not a delusion rising to the dignity of mental aberration." *Fulton* v. *Freeland,* 219 Mo. 494, 517 (118 S. W. 12, 18: 131 Am. St. Rep. 576).

3. The conduct of the trial assumed largely the aspect of hearing a moot case of Myers *v.* Robinson and Stevens, as principal and accessory, wherein the plaintiff charged the defendants with malpractice and sat as judge in the decision of his own case. As to the question of delusion, pursuing the illustration further, it is not for us to consider whether Myers decided that case rightly or wrongly on the evidence before him, nor to say that the penalty of his wrath was too severe upon the defendants, nor yet to determine whether he presided there "with the cold neutrality of an impartial judge." It is rather for us to confine our inquiry to the question of whether there was any evidence which a judge in his situation could consider, and whether he had mental jurisdiction to decide the case at all. In our investigation of that feature of the case, when we arrive at the point where we can say whether or not there were facts before him upon which any one could deliberate and reach a conclusion one way or the other, then, although his deduction from these facts, if any there were, may appear unreasonable or vengeful or wanting in natural affection, our quest is

ended. We cannot go farther, because the property was his to be distributed as he chose, if he could choose, and neither of his children had any vested right to it at that time which we can enforce now.

We proceed, then, to a more detailed analysis of the testimony to ascertain if there is any extraneous evidence or impelling influence, arising otherwise than from the spontaneous action of a diseased mind, to induce the belief on the part of the testator, which is alleged to be a delusion. As a foreword, it is here set down that no situation is disclosed by the record, respecting either the contestant or her mother, inconsistent with the most womanly chastity. Of course, in the conditions of physician and patient, and friend and friend, revealed by the history of the case, there were many opportunities for meretricious relations, when viewed from the standpoint of the evil-minded; but there is no evidence that either of the ladies in question ever broke the faith they pledged at the hymeneal altar. Nor do we think the evidence establishes the charge that Myers imputed unchastity to either his wife or his daughter. Some witnesses testified on that subject; but they were so utterly broken down on cross-examination that, as we believe, the only basis for that branch of the alleged delusion is found, either in a gross misunderstanding of what he really did say, or in a prurient imagination. A careful study of the record impels us to the conclusion that Myers never made the charge or indulged the belief, however deluded, that his wife had been murdered in the sense that would entail capital punishment upon the one who slew her. Throughout this testimony, it constantly appears that, in his discussions of the matter, he attributed the death of his wife to the error or ignorance of the physician in his diagnosis of her case and to his improper treatment, or at least his neglect to give proper treatment to the patient.

The utmost that can be said of his accusation against his wife and daughter was that Robinson had undue influence over them; that they were infatuated with him to such an extent as to cause them to side with the physician as against their husband and father.

On the hypothesis that this tends to sustain the charge as to the nature of the alleged delusion, the situation may be thus illustrated: Suppose that during his lifetime either the physician or the daughter, for the vindication of their good names, as against such charges, had instituted an action against Myers for libel, and that as a defense he had alleged the truth of the matter charged as defamatory. Is there anything in the record before us which would authorize him to take that issue to the jury? As to the diagnosis, all the witnesses who have spoken on that subject say that Mrs. Myers complained from the first of her illness of a pain in her left side. Dr. Samuel T. Songer of Ashland, who was called in consultation by Dr. Robinson about October 15, 1901, states that in his conference with the latter he was informed that the patient was suffering from malarial poisoning. Robinson had been treating her for this affection all this time, and continued it until about the 23d of October. Dr. Songer says that then Robinson came down and said patient had developed, as he thought, a hernia, and would like to have Songer examine her. On such examination, acting upon the theory that the swelling in the lower abdomen was a hernia, they tried to reduce it, but it would not yield to treatment of that kind. They then called in Dr. Pickel, who, on the 25th, operated on what all at that time agreed to be an abscess. There is some dispute in the testimony between Dr. Robinson, on the one hand, and Dr. Pickel, on the other, as to whether it was a psoas abscess or a pelvic abscess; but all agree that the disease was finally and properly determined to

Sig. 13

be an abscess of some kind, and that the original diagnosis of malarial poisoning and the second of hernia were both entirely erroneous. Dr. Songer testified, also, that hernia is not accompanied by malarial symptom or chill, yet, as Dr. Robinson told him, the patient had been suffering from fevers and chills. Dr. Songer says that it was the abscess that caused these chills and fever. Speaking of a pelvic abscess, Dr. Songer also says that a competent physician ought to be able to discover a pelvic abscess within a very few days. Dr. Songer was a witness for the contestant. Mrs. Stratton, another witness for the contestant, went to Ashland September 28, 1901, in the capacity of a nurse for Mrs. Myers. She says she stayed at the hotel three or four days, and then the party, including Mrs. Myers, moved to the residence of Mr. Pracht, and two or three days after that the witness discovered a very sore place on the left side of Mrs. Myers, a lump or swelling about one by four inches in dimension. She says she told Dr. Robinson about it, and he at that time pronounced it hernia. This was at least ten days before he finally determined it to be an abscess, of whatever kind. Dr. A. E. Rockey, another witness for contestant, was called in consultation with Dr. Robinson in the last sickness of Mrs. Myers. Dr. Rockey found her suffering from high fever, rapid pulse, rapid breathing, and a condition of general uneasiness that accompanies such symptoms. Adverting to the abscess of which he was informed, he said, in substance, that the occurrence of the chill and fever would suggest, among the possible causes for the same, an unhealed portion of the abscess and a retention of pus, finding its way into the system and causing the chill and fever. The sinus of the abscess had not entirely closed up, and in examination Dr. Rockey succeeded in passing a probe into it a distance of five or six inches. In speaking of this examination, Dr. Robin-

son says there may have been a drop or two of pus,
because there was a little from time to time from the
skin.   He further says, "a drop of pus located where it
cannot get vent will cause septicemia, as well as a quart."

As to Dr. Robinson, here, then, is the situation, as
Myers might legitimately view it:   For more than three
months the physician had been treating the wife of Myers
for malaria and sciatica, and without success.   There is
ample evidence to show that Myers importuned his wife
to have medical counsel called to consult with Robinson,
but was refused.   It is in evidence, also, that Robinson
flatly declined to consult with other physicians.  True it
is that this is disputed; but that is not the direct issue
here.   After this long course of treatment, he finally dis-
covers a swelling upon the lower part of the abdomen
of the patient, and then pronounces it hernia.   The sequel
shows that his diagnosis was radically wrong, and that
she suffered all this time from an abscess.   The physicians
agree that pus getting into the system will tend to poison,
and that acute nephritis or peritonitis is a natural
sequence, lethal in termination.   Concerning the question
of delusion, we have nothing to do with deciding whether
or not the treatment of Dr. Robinson was the proper
treatment, or such as a reasonably prudent physician
would give under the circumstances.   The only ques-
tion for us to determine is whether or not Myers
had ground to reach the conclusion, upon his course of
reasoning, that his wife had been improperly treated with
fatal results.   If Robinson were the defendant against a
charge of malpractice, in that he caused the death of
Mrs. Myers by lack of sufficient medical skill, there would
be enough in the testimony of the witnesses for the con-
testant to take such an issue to the jury as against his
motion for nonsuit:   *Grainger* v. *Still*, 187 Mo. 197 (85
S. W. 1114: 70 L. R. A. 49).   Under such circumstances

it would be quite as logical to impute insanity to the jurors who would assess damages against the physician in the supposed case upon that evidence as to say that Myers' deduction from the same premises was an insane delusion.

4. As to the influence of Robinson over Mrs. Myers, her refusal to allow other physicians to be called in consultation, at the request of her husband, has been already mentioned. The witness, speaking of that, says that she gave as a reason for her action that it would offend Dr. Robinson. In her letter of November 14, 1899, appearing in the record, Mrs. Myers addresses Robinson as "My Dear Doctor Robinson," and says, among other things:

"We were in hopes Oregon might be favored with your residence but know too many cabbage heads grow here and you want to be where there is culture and intellectuality. Washington may well be proud of such an acquisition to her population, and we are thankful to number you among our intimate friends. We are all well, each joining in love and good wishes for your future happiness and enjoyment."

The contestant herself testifies that when Mrs. Myers, her mother, was sick she sent for Dr. Robinson, and did not want another physician; that Dr. Robinson appeared unwilling to take the case, being anxious to go east, and her mother said if he would just take her through that sickness she would not ask him to treat her again. She further says:

"I think Dr. Robinson had called in Dr. Songer, whom my father had wanted to consult with Dr. Robinson, but my mother was always opposed to it; but finally Dr. Robinson said he must have counsel, and I suggested Dr. Songer, as long as my father had wished him, and he came and made this examination."

Again the contestant speaks of going with her mother to meet Dr. Robinson at Salem, to go on to San Francisco

and spend a little time there; that Robinson was on his way east, and they were all in San Francisco together; and that the party, consisting of herself, her mother, an aunt, and Dr. Robinson, had taken several trips all around California. Of course, this was all with the knowledge of the contestant's husband, and with the acquiescence of her father. It is written large throughout the testimony that, in the controversy and estrangement which arose between her father and Dr. Robinson, the contestant espoused the cause of the latter as against her father. As an evidence of what we may at least term her admiration for Dr. Robinson, we here quote some of her testimony respecting his practice:

"It was very large. He had a surgeon employed by him in the home. The whole house really was given up to his business and practice, and there were a great many people came there from different places. There was one friend that was living in Dr. Robinson's home, besides this Miss Close, that I was very fond of—she was from Chicago—a Miss Vada Weller, whose father and mother had sent her on as I had been sent on, and there were several young ladies from Baltimore; and Major Walker's family was at this same place where I had been sent. I used to have to go for treatment and wait my turn at the doctor's home there, and sometimes it was two hours and two hours and a half before I could get my turn; there were so many people waiting."

Speaking of the class of patients he had, she says:

"Well, they were prominent people, like Erastus Brooks, Mr. C. W. Hunt, J. B. King, all very prominent and wealthy people of Staten Island; and often Dr. Robinson used to take Miss Weller and myself on his afternoon calls in his carriage, and we were driven to those elegant homes. That is all I know, and the beautiful grounds surrounding them; and while Dr. Robinson was in those homes we would be driven by the coachman around until he thought time to return for Dr. Robinson."

She also says that "Dr. Robinson was a personal friend of the famous Dr. Osler, and he was with him and Dr.

Fetterhall." She allowed Robinson to remain as an inmate of her household long after she well knew that her father heartily despised him. We do not criticise her right to do these things or the purity of her intentions, and they are recited only for the purpose of showing that there was some ground for Myers to reason upon and reach the conclusion which he did, whether it was a just conclusion or otherwise.

On the moot issue of libel, with justification pleaded as a defense, on behalf of Myers, which we have used as an illustration, we have no hesitancy in saying that out of the mouths of the witnesses for the contestant enough appears to take that issue to the jury on behalf of Myers. The deduction is plain that there was a plausible basis upon which Myers could reason, and evidently did reason, and arrive at the conclusion that his wife was the victim of malpractice on the part of Dr. Robinson; further, that in opposition to his request and oft-expressed wishes, his wife refused to allow other physicians to be called in consultation, and that his daughter sided with her mother in this contention; and, lastly, that when the estrangement between Myers and Robinson arose as a result of the former's reflections on the facts already narrated, she espoused the cause of Robinson and defended him against her father's displeasure. We conclude that the specification of delusion is not only not proven, but is affirmatively refuted, because Myers had a reason for his judgment on that matter.

It is not pretended that Myers was insane on any other subject, except that connected with the alleged delusion. The testimony shows Myers to have been a pronounced man, ardent in his friendship and equally warm in his resentment. It is said to be only a step from the sublime to the ridiculous, and so it is but a pace from love to jealousy, and from intimate friendship to avowed hostil-

ity. It affirmatively appears that Myers had at least tolerated a very close relation between Robinson and the family of the former. In the treatment of his wife, of whom he was devotedly fond, Myers evidently expected much of Robinson, and when the climax was reached, and he found, as he believed, that the physician at least was ignorant and unskillful in his treatment, the natural result followed in an expressed hatred and dislike of Robinson. It is true that many witnesses, describing Myers' conduct when discussing his wife's death, have said that he would run his fingers through his hair, and his eyes were staring; that he would walk the floor and bitterly denounce Robinson in profane terms, and finally would become almost incoherent in his speech, and finally burst into tears. On this basis, the witnesses variously pronounce him "off," "a maniac," "insane on that subject," and the like; but such testimony is not, in our opinion, sufficient to outweigh the direct testimony and undisputed evidence that, until almost to the day of his death, he successfully managed a very large business, requiring the clearest mind. The witnesses alluded to were not cognizant of the situation as it appeared to Myers; they could not put themselves in his place, and could only determine from their standpoint that his judgment of Robinson was unreasonable or unjust. His conduct on those occasions was quite consistent with the actions of an unreasonably angry man who has been deeply offended in a matter very near his heart. It is proper to further analyze the testimony with reference to the matter of general testamentary capacity, and to determine whether the will was such as a man in Myers' situation, in his right mind, would naturally execute.

Recalling that Dr. Robinson continued in the family of the contestant and her husband after the death of Mrs. Myers, and that hitherto the testator had not charged

his daughter and her husband any rent for the house in which they lived, owned by him, we find that Myers had conceived and did not in the least conceal his dislike for Robinson after the death of Mrs. Myers. Evidently incensed at his daughter for retaining him in her household, and desiring to express his disapproval and possibly get rid of Robinson, Myers directed his agent to notify the contestant's husband that rent would be charged on the residence at the rate of $60 per month from and after April 1, 1902. At this juncture, the contestant's husband sent the testator the following letter:

"The First National Bank, Portland, Ore., March 31, 1902.

"My Dear Mr. Myers:

"Herewith please find check for $60, covering rent of house at 135 22d Street North, for month of April, 1902. This is not a large sum to you, but it is to me, and will make a substantial cut in my income. The worst feature of it lies in the misunderstanding which so many of our friends have regarding the same, for most of them seem to be of the opinion that it has been given to Frances by her father and mother for a home. In fact, only a few days ago, a gentleman asked me how much taxes I had to pay on it, and was very much surprised when I replied that we were only tenants. However, that is nothing new for me, as my greatest handicap both socially and in business, has been on account of my having been connected with a well-to-do family and being obliged to maintain a position in society, which my salary has not warranted. Still, I have so far been able to preserve my credit and my self-respect, and for my own personal discomfort I do not care. With Frances it is different, for she has the right to expect better treatment at her father's hands, and in her weak, nervous condition, the worry and humiliation she has had, is nothing short of criminal. She is neither a child, rogue or fool, and the course she has followed since her mother's death is the only honorable one she could pursue. You are doubtless well aware of the strong attachment which always existed between her mother and herself. When but a child she always saved up the little pin money, which she received,

in order to be able to buy her mother a Christmas or birthday present, and was always anxious to share every little pleasure with her. During her mother's illness, she was with her continually, and had a most excellent opportunity of learning and knowing what her wishes and opinions were. Dr. Robinson has his faults, as do we all, you and myself included, but it is not my object to discuss that now. These facts: that your wife insisted on his remaining in the case; that she urged upon you, at one time, that you owed him an apology, which you gave with apparent sincerity; and finally, the plans which she made regarding her future after her return from Ashland, all go to show plainly what her opinion was in regard to him. These are all indisputable facts, and Frances remains true to her mother's wishes, besides which she owes Dr. Robinson a debt of gratitude for his care and treatment of herself and her mother, which she has too much honor and sincerity to repudiate. How much better for everyone it would have been, if you had only accepted the judgment of the doctors in the case, all of whom say that everything was done that could have been done. You would have saved even yourself much mental excitement and worry. It is easy to say that Dr. Robinson murdered your wife and to call him vile names, but it requires little thought and is no argument. When such serious statements are made, they should be backed up with the knowledge that they could be proven true in court, for nothing but the truth is permitted there. The remarks which you have made to the effect that Dr. Robinson had too much influence with your wife and daughter are being sadly misconstrued, for everyone who knew Mrs. Myers knew her strong character, and that she was one to lead and not to be led. So such statements simply discredit her. For example, only a short time ago, a very influential man, whom you consider one of your best friends, told me that you had said Dr. Robinson had had undue influence with your wife, and he wanted to know if by that you meant, that they had been criminally intimate. I was shocked at the thought, but it shows how such things are most apt to be understood. As for Frances, since you have connected her name in a disrespectful way with the Doctor she will hardly go outside and is very much broken down. Her nerves are in a badly demoral-

ized condition, and there is nothing that can help them while things are being agitated as they are. She certainly has her mother's wishes behind her, and Mrs. Myers was a woman whose guidance it was well to follow. Your antipathy to the Doctor cannot harm him seriously, but instead its effect falls upon your daughter and your wife's good name. I am writing this without the knowledge of either Frances or the Doctor, and hope you will be able to see the right and justice of it, for I have said nothing but facts, pure and simple.

"Yours very truly,<br>. B. F. Stevens."

Upon the tense situation, as it existed at that time, this letter came as a marplot, and, to say the least, it was unfortunate. There is much in it to justly incense Myers A man of his spirit could not bear with composure the statement that Stevens' connection with his family was a great handicap to the latter. In respect to the difference of opinion between Myers and his wife, respecting Dr. Robinson, the letter sums up the situation thus:

"These are all indisputable facts, and Frances remains true to her mother's wishes, besides which she owes Dr. Robinson a debt of gratitude for his care and treatment of herself and her mother, which she has too much honor and sincerity to repudiate."

The statement in the letter that "the remarks which you have made to the effect that Dr. Robinson had too much influence with your daughter are being sadly misconstrued" probably state the exact truth about what Myers said in that connection. It would naturally make any man very angry to have his language, thus expressed, so construed as to mean that his wife and daughter had been criminally intimate with Robinson, yet this is what the letter plainly indicates. Soon after receiving this letter, Myers confronted Stevens and demanded the name of the latter's informant, and on his refusal to give the name he denounced his son-in-law in unmeasured terms. The

testator, at the time and afterwards, expressed his determination that none of his property should go to Stevens. It appears that, although she and her husband had been married since 1892, the contestant had never borne any children, and that her health was delicate. With the possibility, as it seemed to him, that her husband would survive his daughter, the testator evidently took testamentary steps in accordance with his hostility to his son-in-law growing out of the unfortunate letter. It is in evidence that about that time, or soon afterwards, he made a will, bequeathing only a nominal sum to his daughter, and leaving the remainder of his estate to his son. Subsequently he executed the will in question on May 31, 1902. Whitney L. Boise, who drew up the document under the direction of the testator, says, in substance, that the latter was perfectly cool and collected and not in the least excited. The manifestations of temper and incoherent anger described by other witnesses, and upon which they base their opinion that he was insane at other times, were entirely wanting. Myers afterwards submitted the will to Cyrus A. Dolph, and asked his advice as to its regularity and validity, all the while remaining calm and collected. Many witnesses for the proponent, equipped for their judgment by many years of acquaintance with the testator, and who saw him and talked with him about this time, concur in pronouncing him perfectly sound of mind. None of the witnesses for the contestant pretended to say more than this—that Myers was insane. Not one of them gives any opinion as to the degree of his alleged insanity. No witness deposes that he had not sufficient intelligence at the time to know that he was executing his will, to know the property of which he intended to dispose, and to recollect and distinguish among the objects of his bounty. He evidently took a sober second thought in respect to his daughter, and relented in

a degree from his first determination to cut her off with a mere nominal sum. The evident attitude of his mind towards her is delineated in her account of her last interview with her father thus:

"He took on and raved and glared at me, and said that that scoundrel of a husband of mine had written him this letter; that he had not written it; that Dr. Robinson had written it. And he called them both scoundrels, and made it noisy there, and caused so much attention, you know, the loud way he spoke to me, and said he loved me still, and wished I could get away from all of this."

These last words he ever spoke to her testify of his love for the daughter; but she made no change in the situation which so displeased her father. Yet, in the face of all that, he, by his will in question, made her the munificent bequest of $20,000 without condition, even as against her husband, who had deeply offended him, except that it should not be paid to her until she should arrive at the age of 45 years. He explained that this was the probable value of one-half of the property which came to him under the will of his wife, the contestant's mother; but this was only an evidence that he reasoned on the subject, and was not acting on the impulse of insane fury or delusion. That property was his own as much as any other, and we cannot ignore his disposal of it, if he had sufficient mental vigor to construct a will, within the meaning of the long-established rule in this State. He had been an indulgent father to her, had given her $5,000 in one sum to furnish her home when she was married, had paid the expense of her travels, both before and after her marriage, and in many ways had manifested for her a tender affection. From this standpoint, he evidently expected from her something of a different attitude than the one she assumed in the great crisis of his bereavement. It is evident, however, that he reasoned with testamentary capacity in the construction of his will now

in dispute. He lived more than five years afterwards in active business, without any question being raised as to his sanity. He may have been actuated by a desire to punish the contestant, albeit unjustly; but he had the right to punish her in that manner, provided he had testamentary capacity in the degree already defined and supported by a great array of authority.

We are convinced that the preponderance of the testimony establishes that at the time of making his will on May 31, 1902, he had ability in ample degree for that purpose, and that the instrument is one which, under all the circumstances, a man of his temperament would naturally make. Besides the precedents already cited, the following from other states are instructive: *Bohler* v. *Hicks*, 120 Ga. 800 (48 S. E. 306); *Schmidt* v. *Schmidt*, 201 Ill. 191 (66 N. E. 371); *Bauchens* v. *Davis*, 229 Ill. 557 (82 N. E. 365); *Drum* v. *Capps*, 240 Ill. 524 (88 N. E. 1020); *Conner* v. *Skaggs*, 213 Mo. 334 (111 S. W. 1132); *In re Will of James D. White*, 121 N. Y. 406 (24 N. E. 935); *In re Brush's Will*, 35 Misc. Rep. 689 (72 N. Y. Supp. 421); *Buchanan* v. *Belsey*, 65 App. Div. 58 (72 N. Y. Supp. 601); *McGovran's Estate*, 185 Pa. 203 (39 Atl. 816); *Hemmingway's Estate*, 195 Pa. 291 (45 Atl. 726: 78 Am. St. Rep. 815); *Kendrick's Estate*, 130 Cal. 360 (62 Pac. 605); *In re Riordan's Estate*, 13 Cal. App. 313 (109 Pac. 629); *Hartung* v. *Holmes*, 159 Cal. 161 (113 Pac. 130); *Stull* v. *Stull*, 1 Neb. (Unof.) 380, 389 (96 N. W. 196); *Taylor* v. *McClintock*, 87 Ark 243 (112 S. W. 405).

5. Again, the allegation of the contestant's complaint is, in substance, that at and for some time prior to the execution of the will the testator was not of sound and disposing mind or memory, and that during all of that time he labored under the delusion which she describes. No mention is made of the codicil in any manner; yet we find from the record that six months and more after the

execution of the will the testator makes and publishes the supplementary testament, which does not disturb the bequest to his daughter, but only gives directions about how the portion bequeathed to his son shall be distributed, should the latter pass away before the death of the testator. It is not alleged that Myers was in any manner insane or subject to any delusion at the execution of the codicil. The publication of the latter instrument amounts to an affirmance and republication of the testament to which it is a supplement.

"Although the will, when executed, might be bad, or the testator might be *non compos mentis* or under duress or undue influence at its execution, yet, if he was sane and free from duress or undue influence when he executed the codicil, that would be a republication and confirmation of the will, and would free it from the objection to which it was liable at its execution."

*Farr* v. *O'Neall,* 1 Rich. (S. C.) 80, 89. See, also, *Shaw* v. *Camp,* 163 Ill. 144 (45 N. E. 211: 36 L. R. A. 112) ; *Jones* v. *Shewmake,* 35 Ga. 151; *Murray* v. *Oliver,* 41 N. C. 55; *Haven* v. *Foster,* 14 Pick. (Mass.) 534; *Brimmer* v. *Sohier,* 1 Cush. (Mass.) 118; *Hubbard* v. *Hubbard,* 198 Ill. 621 (64 N. E. 1038) ; *Van Cortlandt* v. *Kip,* 1 Hill (N. Y.) 590; *Illensworth* v. *Illensworth,* 110 App. Div. 399 (97 N. Y. Supp. 44) ; *Payne* v. *Payne,* 18 Cal. 291.

The conclusion is that the decree of the county and circuit courts, setting aside the will and codicil in question, are both reversed, and the cause remanded for further proceedings in the settlement and distribution of the estate of the testator in accordance with the directions of the original and supplementary testament hitherto under consideration.                    REVERSED.

Decided July 30, 1912.

ON REHEARING.

[126 Pac. 29.]

MR. JUSTICE BURNETT delivered the opinion of the court.

MR. JUSTICE MCBRIDE and MR. JUSTICE BEAN dissenting.

Upon the *ex parte* petition of George Tobias Myers, Jr., the county court of Multnomah County issued to him letters testamentary on the will of his deceased father. Afterwards, in a proceeding initiated in the same county court by his sister, Georgia Frances Stevens, the petitioner here, to contest the will, the executor named therein again propounded it for probate; but the court refused the same and set the will aside, together with the codicil attached thereto. On appeal to the circuit court, the decree of the county court was sustained. On appeal to this court, the decrees of the county and circuit courts, setting aside the will and codicil in question, were both reversed, and the cause remanded for further proceedings in settlement and distribution of the estate of the testator in accordance with the directions of the original and supplemental testament hitherto under consideration. 121 Pac. 434.

An able petition for a rehearing on the facts was filed, coupled with the contention that in case the court should adhere to its former decision its mandate should be so modified as to send the case back for a jury trial. Both in the county court and in the circuit court, the contestant demanded trial by jury, which was refused in both instances. Although she did not appeal from either of those decrees, she now maintains that she was deprived of the right of trial by jury; and hence this litigation cannot be terminated without that right having been subserved.

6. On September 26, 1849 (Laws 1850-51, p. 274), the

territorial legislature passed "an act respecting wills," providing, among other things, as follows:

"Section 31. If any person interested in the probate of any will shall appear within five years after the probate or rejection thereof and by petition to the district court of the county contest the validity of the will or pray to have the will proved which has been rejected an issue shall be made up whether the writing produced be the will of the testator or not which shall be tried by a jury, or if neither party require a jury, by the court.

"Section 32. The verdict of the jury or the finding and judgment of the court shall be final, saving to the court the right of granting a new trial as in other cases, and to either party an appeal in matters of law to the Supreme Court."

In January, 1853, the territorial legislature passed "An act to establish a probate court and define its duties and powers," which by its provisions was to take effect from and after May 31, 1853. Section 8 of that act prescribes that:

"The judge of probate for each county shall have and possess the following powers: Original jurisdiction in all cases relative to the probate of last wills and testaments, the granting of letters testamentary and of administration. * * To hear and determine all disputes and controversies respecting wills, the right to executorship, administration or guardianship, or respecting duties or accounts of executors, administrators or guardians. * *"

Section 23 lays down the rule that "any person aggrieved by any order, allowance, or sentence, decree, or denial of any judge of probate, or any other act in his official capacity, may appeal therefrom to the district court within and for the same county, provided appeal be taken within twenty days from the date of the proceedings appealed from." Section 30 says that:

"If upon hearing an appeal in the court above any question of fact shall occur that is proper for a jury to try the court may at its discretion cause it to be tried

upon the issue to be formed for the purpose under the direction of the court."

On December 15, 1853, the sections last quoted were re-enacted by the legislative assembly of the territory, as well as the sections relating to the commencement of a proceeding in the district court, without change, although in separate acts of the same date. The territorial law was in this condition at the adoption of the State Constitution, Section 17 of Article I whereof states that "in all civil cases the right of trial by jury shall remain inviolate." Section 7, Article XVIII, reads that "all laws in force in the territory of Oregon when this constitution takes effect and consistent therewith shall continue in force until altered or repealed."

The position assumed by the petitioner now is that, although she commenced her proceeding in the county court, rather than in the circuit court, and has not appealed from either of the decrees, she is yet entitled to be heard before a jury; the issue having been decided against her on the equity trial *de novo* in this court.

Let us first consider the subject as though the constitutional provision that "in all civil cases the right of trial by jury shall remain inviolate" has the widely expanded meaning claimed for it by petitioner's counsel; that the procedure outlined in the territorial statutes mentioned furnishes the ruling definition of the term "trial by jury"; and that in that form it is preserved to the present day.

Under such a liberal construction, we observe that the probate court of that period had original jurisdiction to hear and determine all disputes and controversies respecting wills, and that trial by jury was discretionary with the court, both in the probate court and in the district court on appeal. Thus it is that under the regime of those times jury trial was not a matter of right in will

contests originating in the probate court, to the powers
and duties of which the county court of the present day
has succeeded in pursuance of Section 12 of Article VII
of the State Constitution as it stood prior to the amend-
ment of 1910. It was only in the proceeding initiated by
petition to the district court within five years after
probate or rejection of a will that trial by jury was
awarded as a matter of right. It seems plain that if in
those days a party aggrieved by the terms of a will went
into the probate court with his contention he would be
governed by the trial procedure established in that forum
and in the district court on appeal from the court of
original jurisdiction, including the discretion of the court
as to jury trial. Furthermore, it is equally apparent that
such a party, even in territorial times, would be bound by
the decision of a court of original jurisdiction to which
he had voluntarily submitted his grievance, subject, of
course, to the right of appeal, and would be thereby
barred from afterwards inaugurating a contest by
original proceedings in the district court.

It cannot be that a contest begun in the probate court
and carried to the district court on appeal was after all
idle pastime, leaving the parties free to begin over again
in the district court on the same issue of *devisavit vel non*.
If these several remedies were preserved at all, their
administration is vested in the county and circuit courts,
respectively, as it was formerly in the territorial probate
and district courts; for the constitution, as it was first
adopted, gave to the circuit courts all judicial power,
authority, and jurisdiction not vested by that instrument,
or by laws consistent therewith, exclusively in some other
court. At the same time it invested the county court
with jurisdiction pertaining to probate courts. Article
VII, Sections 9, 12, original constitution. If, therefore,
in territorial times a party attacking a will had his

remedy by a jury trial as of right in the then district court on an original proceeding, and not in the probate court, he must in these latter days, if that remedy survives, seek it in the circuit court, which has succeeded to the powers of the former district court. As said by Mr. Justice SHATTUCK, a distinguished member of the constitutional convention, in *Wright* v. *Young,* 6 Or. 87, 92:

"The Constitution of the State (Section 7, Article XVIII) continued all the laws of the territory in force which were not inconsistent with the constitution. By construction and uniform practice, the jurisdiction and practice of the territorial district court were deemed transferred to the circuit court, and in the territorial statutes, compiled and published in 1855, were recognized as the law of the State regulating and controlling the practice and decisions of the circuit court."

The conclusion on this view of the case is that, if the trial by jury is to be awarded at all as of right in will contests, it must be in an original proceeding initiated in the circuit court as successor of the territorial district court, and is not demandable in cases brought there on appeal. As applied to the present contention, it leads to the conclusion that the petitioner voluntarily took her complaint into a tribunal where a jury trial in such disputes was never more than discretionary, knowing, also, that the same conditions obtained on appeal; and, under such circumstances, she cannot now be heard to demand a jury trial as of right.

7. Thus far we have accepted as a postulate the contention that the statute of September 26, 1849, re-enacted in the main December 15, 1853, authorizing will contests by jury trial in the district court, was a valid law in existence at the adoption of the constitution, and hence to be considered in the definition of the term "trial by jury." In Section 9 of the act of Congress of August 14, 1848, establishing the territorial government of Oregon

(Chapter 177, 9 U. S. Stat. at Large, 323), we read that "the judicial power of said territory shall be vested in a supreme court, district courts, probate courts, and in justices of the peace. * * The jurisdiction of the several courts herein provided for, both appellate and original, and that of the probate courts and of justices of the peace, shall be as limited by law. * * And each of the said district courts shall have and exercise the same jurisdiction in all cases arising under the Constitution of the United States and the laws of said territory as is vested in the circuit and district courts of the United States. * *" Section 6 of the same act provides "that the legislative power of the territory shall extend to all rightful subjects of legislation not inconsistent with the Constitution and laws of the United States," and, after detailing sundry restrictions on the power of the territorial legislature, declares generally that "all such laws or any law or laws inconsistent with the provisions of this act shall be utterly null and void." That federal statute set bounds upon the powers of the territorial government, both as to its courts and its lawmaking powers. In a sense, it was the territorial constitution, and by it all the enactments of its lawmakers must perforce be construed.

A national statute of almost identical terms, relating to the government of the territory of Idaho, was considered in *Moore* v. *Koubly,* 1 Idaho, 55. It appears in that case that the legislature had enacted a law giving the probate court appellate jurisdiction over cases originating in the justice's court. After setting out extracts from this statute, the court says:

"Sufficient is here quoted from that act to indicate generally the distribution of the judicial power among the several courts created thereby, and the character and the extent of the jurisdiction with which those inferior courts are invested, as well as the authority under which

the legislature attempted to clothe the probate courts with appellate jurisdiction. In other words, a complete judiciary system was by that act established, with the general nature and extent of the jurisdiction conferred upon each branch thereof either declared by the express terms of the act itself, or by the terms by which those courts are designated. * * The conclusion from the foregoing is then but reasonable and proper that when Congress used the terms by which they designated the several courts they established in these territories, and in distributing the power among them, they intended to and did use these terms by which these courts are denominated with reference to their well-known and uniformly accepted definition, and they intended to confer upon and invest these courts, respectively, with such jurisdiction and power only as legitimately and properly belongs to them, and as indicated by their several titles."

The same doctrine of restricting territorial courts to the jurisdiction allotted to them by the organic act is announced in *People* v. *Du Rell,* 1 Idaho, 44.

A very similar statute, organizing the government of the territory of Kansas, was construed by the Supreme Court there, in *Locknane* v. *Martin,* McCahan (Kan.) 60. Rehearsing the provisions of the statute involved, and descanting upon the duties of those who administer the government, the court goes on to say:

"They have no right to enlarge upon the powers therein imparted, or change them so as to allow or permit one department of the government thereby created to encroach upon the legitimate province of another; nor can the peculiar arrangement and characteristics of either of those departments, as fixed by this law, be altered or in any manner changed by adding thereto or transferring the attributes and powers, which properly belong to one, from it to any other branch or portion of the same department; nor can the peculiar jurisdictional sphere of action of any of the branches or divisions of the same department, as organized by this law, be increased or diminished, so far as the province of its power is concerned. Each department is required to act within its own limits and

sphere of organic power; and, where the powers created for any one of the principal departments are, by this fundamental law, subdivided and, for the purposes of administration, distributed and appropriated to several tribunals in the same general department, the arrangement of distribution so made must be carefully observed and maintained by those who act officially in the affairs of the government thus created."

The same principle is established by the Supreme Court of the United States, in *Ferris* v. *Higley,* 20 Wall. 375 (22 L. Ed. 383), in construing the act of Congress organizing the territory of Utah—a law practically identical with the Oregon act on the points under consideration. *McCray* v. *Baker,* 3 Wyo. 192 (18 Pac. 749) ; *Webster* v. *Seattle Trust Co.,* 7 Wash. 642 (33 Pac. 970: 35 Pac. 1082).

The national Congress, by the act in question, arranged and adjusted the judicial powers of the territorial government of Oregon, giving certain prerogatives to each of the courts mentioned. *Ex vi termini,* the probate courts had the authority to take proof of wills. The district courts were charged with the powers usually exercised by the circuit and district courts of the United States. Neither of those courts of the general government ever had jurisdiction to take proof of wills, at least as between contesting parties, all of whom were residents of the territory, and hence not affected by diverse citizenship. It was certainly inconsistent with the provisions of that statute for the legislature to attempt to readjust the judicial powers by giving to the district court authority by an original proceeding to take anew the probate of a will and determine the validity of such a document. If the lawmaking power could take from the probate court part of its well-known jurisdiction in the authentication of wills and give it to the district court, it would have been equally proper to vest the probate court with the appellate jurisdiction denied in the cases already cited.

The act itself declares the condemnation of such inconsistent legislation, and pronounces it utterly null and void. The conclusion is that the act of December 15, 1853, so far as it confers authority upon the district courts to take probate of wills, was void, being inconsistent with and in derogation of the act of Congress organizing the territorial government of Oregon. The petitioner here can take nothing on account thereof, and it is not to be considered as an element in the determination of what is meant by a jury trial as contemplated in our State Constitution.

8, 9. Again, conceding that such an act could be regularly passed, it was equally competent for the legislature which made it, or for the people in ordaining a constitution, to make provision for its repeal. It was an expansion of the common-law rule about trial by jury, and could be retracted in any event so long as trial by jury, as known at common law, was unimpaired in litigation to which it was applicable. The constitution fixed the status of such legislation by declaring in Section 7 of Article XVIII that "all laws in force in the territory of Oregon when this constitution takes effect, and consistent therewith, shall continue in force until altered or repealed." In consonance with the authority thus reserved, the territorial act under consideration was repealed by the enactment of the Code of Civil Procedure, which granted to the county court exclusive jurisdiction to take proof of wills. Section 936, L. O. L. Notwithstanding any territorial legislation, it was competent for the people to provide in their constitution, as they did, for a county court having superior jurisdiction as a court of probate. The people also had authority to retain as they did, in their fundamental state law the right to repeal territorial laws on the subject of wills, and to say that the jurisdiction of the county court in respect to them

should be exercised after the manner of courts of equity. (Section 1135, L. O. L.) wherein there is no jury, except at the discretion of the chancellor, and then only in an advisory capacity. That the county court is one of exclusive and superior jurisdiction in the probate of wills is taught by many decisions of this court, among which are *Tustin* v. *Gaunt*, 4 Or. 305; *Monastes* v. *Catlin*, 6 Or. 119; *Lawrey* v. *Sterling*, 41 Or. 518 (69 Pac. 460).

10. It remains to consider whether proceedings in probate under the system of jurisprudence in this State are "civil cases" in which "the right of trial by jury shall remain inviolate." It cannot be denied that in the most general classification of cases into civil and criminal the probate of wills would be in the category of civil cases. But in respect to the mode of trial there has always been a further distinction between cases on the law side of the court and those in equity; civil cases, strictly speaking, being those at law. This distinction is recognized in a certain sense in the original Article VII of our State Constitution, Section 12 of which reads thus in part:

"The county court shall have the jurisdiction pertaining to probate court * * and such civil jurisdiction not exceeding the amount of five hundred dollars and such criminal jurisdiction not extending to death or imprisonment in the penitentiary as may be prescribed by law. * *"

If the people had intended to include the probate of wills in the category of "civil cases," they would not have mentioned probate jurisdiction separately in the section above noted. The term "civil jurisdiction" would have been sufficient for all purposes.

In *Morgan's Estate*, 46 Or. 233, 235 (77 Pac. 608: 78 Pac. 1029), wherein were involved claims amounting to more than $3,000 against the estate, Mr. Justice BEAN, considering the section, said:

"It is argued that the examination and allowance of a claim against an estate * * is the exercise by the county court of civil, as distinguished from probate, jurisdiction, being therefore limited to claims which do not exceed $500. In our opinion, this view is erroneous. By the constitution, county courts are vested with the jurisdiction pertaining to courts of probate, and the legislature is authorized to confer upon them limited civil and criminal jurisdiction. The two jurisdictions, however, are as separate and distinct as if conferred upon separate tribunals."

In *State* v. *McDonald,* 55 Or. 419, 434 (103 Pac. 512: 104 Pac. 967: 106 Pac. 444) in an opinion by Mr. Justice SLATER, this court makes jury trial as of right a distinguishing characteristic of actions at law.

In *State ex rel.* v. *Mann,* 76 Wis. 469 (45 N. W. 526: 46 N. W. 51), the question was the meaning of a clause of the constitution of that state to the effect that "the legislature shall impose a tax on all civil suits commenced or prosecuted in the municipal, inferior or circuit courts." The court in construing this clause employed this language:

"But another and conclusive reason why the tax here imposed cannot be justified under the section of the constitution quoted is that the settlement of estates in courts having probate jurisdiction is essentially proceedings *in rem,* and not 'civil suits commenced and prosecuted,' within the meaning of the constitution. It is upon this theory that the federal courts have uniformly disclaimed jurisdiction in probate matters, since such jurisdiction is not conferred by the words, 'the judicial power shall extend to all cases in law and equity arising,' etc. Section 2, Article III, Constitution of United States."

It is decided in *Powell* v. *Powell,* 104 Ind. 18 (3 N. E. 639) ; *Grand Lodge* v. *Elsner,* 26 Mo. App. 108; *Isaacs* v. *Tinley,* 58 Ga. 457, and *Gilbert* v. *Thomas,* 3 Ga. 575, that equity suits are not "civil cases," within the meaning of the term used in the Bill of Rights. The same rule is

directly applied to probate of wills in *Welch's Will*, 69 Vt. 127 (37 Atl. 250), and *Cartwright* v. *Holcomb*, 21 Okl. 548 (97 Pac. 385).

Mr. Justice MILLER, in *Ferris* v. *Higley*, 20 Wall 375 (22 L. Ed. 383), says of probate courts:

"Such courts are not in their mode of proceeding governed by the rules of the common law. They are without juries, and have no special system of pleading."

Again, in the language of Mr. Chief Justice APPLETON, in *Bradstreet* v. *Bradstreet*, 64 Me. 204, 209:

"Courts of probate are of special and limited jurisdiction. Their proceedings are not according to the course of the common law. They have no juries. Neither party upon appeal can claim, as a matter of right, a trial by jury. The judge of the appellate court may form an issue when, in his judgment, any question of fact occurs proper for a trial by jury, and not otherwise. The issue is to be formed and tried at law, but, as in equity, to inform the conscience of the court and under its direction."

Much has been said about the issue *devisavit vel non* being always decided by a jury at common law, and so, indeed, it was in all actions at law where the will was called in question; but in equity, like any other issue there, it was submitted to a jury only in the discretion of the chancellor to inform his conscience. For instance, a testator had devised his lands to the exclusion of his heir. the latter would bring his action of ejectment against the devisee in possession, who, to maintain his title, would be put to proof of the will, as a grantee would of a deed, and the validity of the will would be determined by the jury as an incident to the main issue. On the other hand, a devisee in possession might maintain against the heir a bill in equity like our modern suit to quiet title, wherein the validity or authenticity of the will would be involved, but in which the issues would be determined by the chan-

cellor as in other suits. Treating of such suits, Mr. POMEROY says:

"The sole ground of this jurisdiction in England was a condition of the law which does not exist in any American state, and no longer exists in that country. Until the statute creating the probate court (about 1857, 20 & 21 Vict. c. 77), there was no jurisdiction whatever to admit a will of land to probate; the only mode of testing the validity of such will was by an action of ejectment between the heir and devisee. If the devisee is in possession, he cannot, of course, bring an action of ejectment, but must await an action brought by the heir. For this reason, to enable the devisee to test the validity of the will at once, and to relieve him of the cloud hanging indefinitely over his title from the heir's adverse claim, the jurisdiction described in the test exists. No such reason exists in this country. A will of land, as well as one of personal property, may be admitted to probate, and in some states the probate is conclusive upon all parties. The devisee can therefore at any time establish the validity of the will in the probate court, and is under no possible necessity of resorting to equity for such relief. On the contrary, the doctrine seems to be general, if not universal, throughout the states that a court of equity will not recognize nor act upon a will of land or of personalty until it has been admitted to probate." 3 Pom. Eq. Jur. § 1158, note 3.

Such is the rule in this State. *Willamette Falls, etc., Co.* v. *Gordon,* 6 Or. 175; *Jones* v. *Dove,* 6 Or. 188.

11. In the endeavor to escape the effect of the statute (Section 1135, L. O. L.) requiring the county court to proceed as in equity rather than at law, contention was made at the argument for a distinction between mere proof of a will in common form and a proceeding like the present one to set it aside; but such a distinction is not well founded in reason. In either case the proponent must prove the will. The burden is upon him, whether the proceeding be *ex parte,* or upon an issue raised between adverse suitors: *Hubbard* v. *Hubbard,* 7 Or. 42;

*Clark* v. *Ellis,* 9 Or. 128; *Mendenhall's Will,* 43 Or. 542
(72 Pac. 318: 73 Pac. 1033) ; *Pickett's Will,* 49 Or. 127
(89 Pac. 377). The question is always the same, whether
the litigation be amicable or adverse, namely, the proof
of the will.

No matter whether the proceeding is for probate of the
will in common form or in solemn form, whether *ex
parte* or contested, whether it was commenced in the pro-
bate court or the district court of the territorial regime,
or in the present day county court, all that is accomplished
in any of the proceedings in question is that the propon-
ent, with the affirmative of the issue resting upon him,
either succeeds or fails in his attempt to prove the will.
From whatever point we view the case, it is still the pro-
bate of a will—neither more nor less.

It is of no consequence whether the statute of Decem-
ber 15, 1853, was inconsistent or not with the act of Con-
gress organizing the government of the territory, or
whether or not it had the approval of the national legis-
lature. The constitution adopted by the people in 1857
had the approval of Congress on the admission of the
State into the Union, and by reason thereof superseded
all previous legislation of every kind, except as stated
in its own terms. It was in effect a congressional enact-
ment itself. Whereas at best under the territory the
probate court and the district court had concurrent juris-
diction of the probate of wills, so that any one interested
might litigate such matters in either court, the people by
their constitution called into being the circuit court and
the county court; both of them being courts of record hav-
ing general jurisdiction. They reserved the right to
define, limit, and regulate that jurisdiction by law in
accordance with the constitution. Section 1, Article VII,
Constitution of Oregon. By Section 12 of the same article
they gave the county court what has always been con-

strued to be exclusive jurisdiction pertaining to probate courts, and, having carved this much out of the mass of original judicial authority, they bestowed the remainder upon the circuit court in Section 9. All this had the approval of Congress. Not resting with this ademption of the at least doubtful jurisdiction of the district court over wills by vesting it exclusively in a kind of court which never had a jury, unless at its own discretion, to wit, a county court sitting as a probate court, the legislative power of the State, in more explicit terms in the Code of Civil Procedure, so defined, limited, and regulated the constitutional power of that court as to give it, in so many words, exclusive jurisdiction to take proof of wills. Section 936, L. O. L. Not only so, but the legislature went further and required that court to proceed as in equity, as distinguished from the conduct of an action at law. Section 1135, L. O. L. Having already, in Section 12 of Article VII, distinguished between probate and civil jurisdiction, effectually taking the former out of the category of "civil cases" mentioned in Section 17 of the Bill of Rights, the people, by their representatives, in this manner gave strong legislative construction to their constitution against a jury trial as of right in the probate of a will by classing such litigation as an equity proceeding. This legislation conforms to the State Constitution which Congress approved, so that putting the proof of wills into equity, with all its incidents of trial, was a proper exercise of legislative power, irrespective of what had existed before.

The conclusion is that, in lieu of the old probate court, the constitution established a county court, which, like other courts named in Section 1 of Article VII, "shall be courts of record, having general jurisdiction to be defined, limited and regulated by law in accordance with this constitution." To this court the people by their organic

act, in Section 12 of the same article, committed the jurisdiction pertaining to courts of probate, with its incidents of trial, and distinguished it from civil jurisdiction as contemplated in Section 17 of Article I, preserving the trial by jury in civil cases. It was quite in harmony with this fundamental law for the legislative assembly afterwards to define, limit, and regulate the jurisdiction of that court, so that its proceedings should be "in the nature of a suit in equity, as distinguished from an action at law." To this result the territorial legislation of December 15, 1853, forms no obstacle, both because it was void as inconsistent with the law organizing the territory of Oregon, and for the reason that it was superseded by the constitution, giving such jurisdiction to another court, and, further, that the people retained the right to repeal it, and did so by the adoption of the Code of Civil Procedure in 1862. This code has been recognized and acted upon for a half century without question until the filing of this petition. As said by Mr. Justice BOISE, in *Tribou* v. *Strowbridge,* 7 Or. 156, 159:

"Was there doubt as to the constitutionality of this statute, it would, under the circumstances and the sanction of long usage, have to be solved in favor of the statute."

It follows that in this litigation, in the nature of a suit in equity, neither party could, as a matter of right, demand a jury trial.

We adhere to the former decision.     REVERSED.

MR. JUSTICE MCBRIDE delivered the following dissenting opinion.

I regret that I cannot concur with the conclusion reached by the majority of the court, and will briefly state my reasons for dissenting.

I regard it as established by the great weight of authority that, when the framers of the constitution used the language, "in all civil cases the right of trial by jury shall remain inviolate," they meant that the system of trial by jury, which was then in existence, and which had been in existence for years, and which had been tried and found satisfactory, should remain intact. It seems to me that this is so unquestionably settled by the decisions of this court that it may be regarded as *stare decisis*. In *Tribou* v. *Strowbridge,* 7 Or. 156, Mr. Justice BOISE, speaking for the court, uses this language:

"This language of the constitution indicates that the right of trial by jury shall continue to all suitors in courts in all cases in which it was secured to them by the laws and practice of the courts at the time of the adoption of the constitution. * * So that, in order to ascertain whether such right exists in this case, we must look into the history of our laws and jurisprudence at and before the adoption of the State Constitution."

This declaration derives additional weight, not only from the great reputation of the jurist who uttered it, but from the additional fact that he sat as a member of the convention which framed the constitution, and that both his associates, Justices KELLY and PRIM, who concurred in the opinion, were members of the same body. Rousseau's remark, that "he who made the law best knows how it should be interpreted," applies here with peculiar force. If anybody knew what was in the minds of the framers of the constitution when they incorporated into it this valuable bulwark of our liberties, these three men knew. To the same effect as the case above cited is *Deane* v. *Willamette Bridge Co.,* 22 Or. 167 (29 Pac. 440: 15 L. R. A. 614) ; *Fleischner* v. *Investment Co.,* 25 Or. 119 (35 Pac. 174) ; *Raymond* v. *Flavel,* 27 Or. 219 (40 Pac. 158). These cases are conclusive upon this court, and are supported by the better authorities from

other jurisdictions. *Whallon* v. *Bancroft,* 4 Minn. 109 (Gil. 70) ; *Spriesterbach* v. *Schmidt,* 64 Minn. 211 (66 N. W. 721) ; *Cockrill* v. *Cox,* 65 Tex. 669; *Tabor* v. *Cook,* 15 Mich, 322; *B. & M. C. C. & S. M. Co.* v. *Montana O. P. Co.,* 26 Mont. 146 (66 Pac. 752), and many other cases.

It is also contended that this is not a "civil case," within the meaning of the constitution; but in my judgment this contention is unsound. The framers of the constitution were dealing with broad generalities, and not with details. Broadly speaking, cases in the courts are divided into two classes, civil and criminal, and as the term "civil case," as here used, is with the intent to include all proceedings not criminal, as the latter are elsewhere separately provided for in the constitution. It will be noticed that the word "case" is used—not "suit" or "action", which are terms of narrower signification: *Aldrich* v. *City of Providence,* 15 R. I. 613 (10 Atl. 592). But this court is committed to the doctrine that even the narrower term "civil action" includes proceedings· in equity, as well as actions at law. *In re Fenstermacher* v. *State,* 19 Or. 504, (25 Pac. 142), Mr. Justice Lord, speaking for the court, expressly holds that "the phrase 'civil actions' includes actions at law or suits in equity and all other judicial controversies in which rights of property are involved, and is used in contradiction to 'criminal action.'" I quote the foregoing from the syllabus, which was prepared by the justice who wrote the opinion. Thus, to hold that a proceeding in equity is not a civil case, we must overrule the decision of our own court, which has stood unquestioned for nearly a quarter of a century. This opinion is strengthened by decisions of other courts: *Dow* v. *Norris,* 4 N. H. 16 (17 Am. Dec. 400) ; *Carpenter* v. *Jones,* 121 Cal. 362 (53 Pac. 842) ; *United States* v. *Ten Thousand Cigars,* 28 Fed. Cas. 39.

It is admitted that, unless the act of 1853, giving a

contestant of a will the right to apply by petition to the district court, was void, such petitioner would have had the right to demand a trial by jury in that court; but it is claimed that the constitution, by establishing the county court and investing it with probate jurisdiction, took away from such petitioner the right of trial by jury.  Such, in my opinion, is not the case.  It is not the forum nor the technical procedure that is to remain permanent, but it is the right.  It is probable that Section 936, L. O. L., taken in connection with the repeal of the statute of 1853, gives the county court exclusive jurisdiction in the first instance in all will contests.  Indeed, this would seem necessarily to follow; but it does not follow that because the forum was changed the right was destroyed.  There is provision by law for juries in the county court, and, if there were not, there remained an appeal to a tribunal where there existed ample provision for such trial.  Petitioner was compelled, first, to litigate her case in the county court, and by its ruling she was compelled to litigate without a jury.  She was again compelled to litigate it in the circuit court, without a jury, and, as the decree was wholly in her favor, she could not appeal from the previous ruling.  In my opinion there are two courses open to this court, by either of which her constitutional rights may be preserved:   (1) The proponent, having insisted upon a trial by the court, should be deemed to have waived a right of trial by jury, and the findings of the circuit court should be treated as the verdict of a jury in such cases, and the judgment affirmed; or (2) the case should be reversed and sent back to the circuit court, with directions to award petitioner a jury trial.

This is peculiarly a case for a jury.  There are few questions of law involved; the whole matter resolving itself into a question of the sanity of the testator—a question which an intelligent layman is just as competent

Sig. 14

to solve as a judge. Even if the granting of a jury trial was discretionary, I am inclined to the opinion that a refusal to grant it, in this instance, was an abuse of discretion, which should be remedied by a retrial. Personally I do not feel convinced by the evidence that the deceased was insane; but the testimony was conflicting, and much of it on behalf of contestant exceedingly strong, and I believe petitioner should have had the benefit of the judgment of twelve men, instead of five.

In the majority opinion it is intimated that the act of 1853, investing the district courts with power to reopen the probate of a will and grant a jury trial of the issues framed before a jury, is contrary to the organic act, and void. It is said that, as the act created a probate court, its jurisdiction was necessarily original and exclusive, and that, as the organic act stood practically as a constitution, so far as the legislative powers of the then territory was concerned, any attempt to take away any of the powers of the probate court was nugatory. In support of this argument the cases of *Ferris* v. *Higley,* 20 Wall. 375 (22 L. Ed. 383) ; *Moore* v. *Koubly,* 1 Idaho 55; *Locknane* v. *Martin,* McCahan (Kan.) 60, and other cases are cited. In the organic acts of all these territories the probate court was created as such, without any other jurisdiction. Outside of its legitimate sphere, it was granted no authority or jurisdiction whatever. The cases all arose from an attempt to wrest jurisdiction, expressly granted to other and higher courts having practically general and superior jurisdiction, from such courts and vest it in the probate courts. I have found no case, and believe that none exists, holding that the territorial courts might not be invested with power to review, by an original proceeding or otherwise, the acts of the probate court, and this was all that the act of 1853 attempted to do. Such proceeding could only be commenced after the probate court had acted. It was a proceeding to reopen

the probate of a will already had *ex parte,* and without
a jury, and for the purpose, among others, to give the
contestant any opportunity to have the validity of the will
passed upon by a jury. It was a proceeding somewhat
in the nature of a bill of review, but brought in a dif-
ferent court than that in which the original proceeding
was had, probably because probate courts, as such, had
no power granted by the organic act to review their
own proceedings. It was not a proceeding to probate a
will, but to set aside such probate, or to determine whether
the alleged will was such an instrument as should have
been admitted to probate. This fact having been deter-
mined by a jury, for which no provision had been made
in the probate court, the further proceedings in the pro-
bate court with respect to the will would naturally pro-
ceed, subject to the findings of a jury, as to its validity.
The fathers of free government in Oregon were jealous
of any encroachment on the right of jury trial, and care-
fully preserved that right in the matter of contests in
regard to the validity of wills by providing for a hearing
in a court where juries were permitted.

It will also be noticed that the organic act of Oregon
provided that all laws passed by the legislative assembly
should be submitted to Congress, and, if disapproved by
that body, such act should be null and void. The pre-
sumption of law is that this was done, and the failure of
Congress to disapprove the act in question is, to my mind,
a tacit approval of it. This provision of the organic act
does not seem to have been given consideration in the
cases cited. In some of the territories no such provision
appears. But, even granting that the act of 1853 was
technically a violation of the organic act, it was recog-
nized in the territory of Oregon, and had never been
judicially declared to be void; and the apparent rights
under it were entirely within the spirit of the constitu-
tional provision and within its evident intent, considering

the state of affairs existing when it was adopted, and when the State was admitted.

It is contended that, the constitution having provided that the legislature should have the right to define, limit, and regulate the jurisdiction of the county court and other courts, and having vested probate jurisdiction exclusively in the county court, the admission of the State by Congress, with such provisions in its constitution, operated as an implied constitutional and congressional repeal of the act of 1853; but such provisions in the constitution should be read in connection with the other provisions of the constitution, providing that the "right of trial by jury in civil cases shall remain inviolate." Reading this provision, as we should, into the section creating and defining the jurisdiction of the county court, the irresistible conclusion is that only the forum for trial is changed, and that the right to trial by jury is preserved.

It is also suggested, and with much plausibility, that, as trial by jury in these cases has not been generally recognized in this State since the adoption of the constitution, this circumstance furnishes a strong argument against the claim of petitioner in the case at bar. I have never heard, either of its being demanded, or refused or granted, though all of these things may have occurred. It may be true, and no doubt is, that the provisions of the constitution and laws which in my judgment, give such right in cases of this kind have been generally overlooked; but, "though the law hath slept, it is not dead," and the right of trial by jury is one so precious, so vital to the preservation of our liberties, that we can well afford to search a little to find it, even to the extent of raking over the dead ashes of the past 50 years. It is a coal from the altar of liberty, and we should rather blow it into a flame than seek to extinguish it.

The cause should be retried by a jury.

Mr. Justice BEAN concurs in the foregoing opinion of Mr. Justice MCBRIDE.