Argued December 11, 1951, affirmed February 14, petition for
rehearing denied March 12, 1952.

FLOREY ET AL. *v.* MEEKER ET AL.

240 P. 2d 1177

*Charles W. Reames,* of Medford, argued the cause and filed briefs for appellants.

*F. P. Farrell,* of Medford, argued the cause for respondent, Ruth Esther Meeker. With him on the brief was B. Kent Blackhurst, of Medford.

*Philip B. Lowry,* of Medford, argued the cause for respondent, The First National Bank of Portland, Oregon. On the brief were Neff, Frohnmayer & Lowry.

*Frank J. Van Dyke,* of Medford, argued the cause and filed a brief for respondents, Eleanor Jane Meeker and Frank Van Dyke, guardian of her estate.

Before HAY, Acting Chief Justice, and ROSSMAN, LATOURETTE, WARNER and TOOZE, Justices.

WARNER, J.

The plaintiffs in this suit are three cousins of Clarence A. Meeker, deceased. In a joint and mutual will executed by Mr. Meeker and his wife, pursuant to

contract, the plaintiffs were named, together with two other cousins of Mr. Meeker, as legatees to five-eighths of the surviving testator's residuary estate. They brought suit to compel specific performance of the will contract insofar as they claim it provided for them under Article VIII. From an adverse decree in the circuit court, they appeal.

Clarence A. Meeker and his wife, Minnie, were married in 1910. Although no children were born of this marriage, they left surviving them an adopted daughter, Eleanor Jane Meeker. Until 1938, Mr. Meeker operated a mercantile business known as the M & M store, originally established by his father in Medford, Oregon. Minnie Meeker during the same period gave music lessons, took in roomers and occasionally helped in her husband's store. In the years prior to May 31, 1938, each had been able through thrift and enterprise to accumulate considerable property of substantial value. Both then being elderly, it was their mutual wish to arrange their affairs so that their respective acquisitions would upon their death pass in accordance with their design and wishes. To achieve that end, they entered into a contract to execute what they denominated a "Joint & Mutual Last Will & Testament," and on May 31, 1938, jointly executed the will which we are here called upon to construe.

The parties have stipulated that the terms of the contract are as set forth in the joint will executed by Mr. and Mrs. Meeker. No contention is made by appellants that there was any contractual understanding between the testators beyond that found within the instrument which they signed. It, therefore, follows that our construction of the will is a construction of the contract; and our construction of the contract, by the same token, becomes a construction of the will.

With the exception of the signatures and attestation clause, the will as jointly executed by them in May, 1938, is:

"KNOW ALL MEN BY THESE PRESENTS, that we, CLARENCE A. MEEKER and MINNIE C. MEEKER, husband and wife, of the city of Medford, Jackson County, Oregon, both of us being of sound mind and disposing memory and having concurrently herewith entered into a mutual agreement for the testamentary disposition of our and each of our property in the manner hereinafter set forth, do hereby make, declare and publish this our Joint and Mutual Last Will and Testament, hereby revoking all previous wills and testaments at any time made by us, or either of us.

"I

"Each of us does hereby direct that upon his death all of his just debts and the expenses of his last sickness and burial be first paid out of his estate.

"II

"I, said Minnie C. Meeker, do hereby give, devise and bequeath unto my father, C. H. Corey, the sum of $3,000.00; unto my brother, C. E. Corey, the sum of $3,000.00, and unto my brother, L. H. Corey, the sum of $3000.00. I direct that any amounts that any of the foregoing legatees shall have borrowed from me be deducted from the amount paid to him and the balance only be paid to him. In the event of the death of any one or more of the foregoing legatees, prior to my death, I direct that his or their portion shall be paid over to the survivor or survivors in equal shares. I direct that the foregoing legacies shall be paid to said legatees as soon after my death as can be conveniently done without inconvenience to my estate, but in any event within three years from the date of my death.

"I, said Minnie C. Meeker, do hereby give, devise and bequeath unto The First National Bank of Port-

land the sum of $3,000.00 in trust for the following uses and purposes:

"I direct that said amount shall be held by said trustee and that the same shall be invested in government securities. I direct that from said fund there shall be paid to Bill Corey, my nephew, to cover the cost of a college education for him, the sum of $700.00 during his first year in college, the sum of $700.00 during his second year in college, the sum of $700.00 during his third year in college, and the remainder, including any accrued income thereon, during his fourth year in college. In the event said Billy Corey does not go to college or complete the full four-year course, the full amount of said fund or the balance thereof is to be kept invested by said trustee as aforesaid and paid over to him with all accumulations when he attains the age of 40 years, and shall thereafter be paid to him at the rate of $300.00 per year in payments of $150.00 semi-annually until said fund is exhausted. In the event of the death of said Billy Corey prior to his receiving the whole of said fund, any balance remaining shall be paid over to and become a part of the trust fund created for my daughter as hereinafter provided.

## "III

"The one of us first to die does hereby give, devise and bequeath unto the survivor all of his household furniture, automobiles and personal effects, and the real estate occupied by the parties as a home at the time of his death.

## "IV

"The one of us first to dies does hereby give, devise and bequeath unto the survivor and The First National Bank of Portland, Oregon, the sum of $50,000.00 in money, or in the concurring option of said trustees, in any securities owned by such decedent at the time of his death at the market value thereof.

"(a) Said trustees shall hold said trust fund and estate; they shall invest and keep the same in-

vested in sound bonds or notes secured by first mortgages upon real estate, having in mind as high an income as is consistent with safety, and no higher.

"(b) They shall have power to collect, compromise, sell or exchange from time to time any securities belonging to said trust fund and to invest and reinvest the proceeds realized therefrom as above provided. In case the survivor of us shall at any time become incapacitated, and in the event of his or her death, then said The First National Bank of Portland, Oregon, shall act as sole trustee hereunder.

"(c) Said trustees shall at convenient intervals pay and distribute to the survivor of us, during the term of his life, the net income arising from said trust estate, the same to be his absolutely.

"(d) If either of us shall at any time, in the opinion of said trustees, require any additional amounts from said trust estate for his proper maintenance or care, the same shall be paid to him from time to time from the body thereof.

"(e) Upon the death of the survivor of us, all of the income from said trust estate as aforesaid, shall be paid to our adopted daughter, Eleanor Jane Meeker, upon her reaching her majority, at convenient intervals during the term of her natural life and in case said income is not sufficient to pay said Eleanor Jane Meeker at least $125.00 per month, there shall be paid to her at least said amount and there shall, in addition, be paid to her such amounts in excess thereof as may, in the opinion of said trustees, be necessary to properly care for and support her and provide her with any needed medical or surgical care after the death of the survivor of us, the excess of such payments above the income of said trust estate to be paid from the body thereof and said trustee may, in its discretion, replace from subsequent income any of the amount of principal so withdrawn, after making the payments to our said daughter as above provided.

"(f) In the event of the death of both of us

during the minority of our said daughter, it is our wish that a suitable guardian of her person and estate during her minority be appointed and that sufficient funds be paid by said trustee from the income, or, if necessary, from the body of said trust estate, to properly care for and educate her and it is our will that a reasonable amount be paid direct to her from time to time to be used by her for her personal expenses, and it is further our will that she be educated at Willamette University or some other educational institution of like character. We further direct that upon her reaching her majority any accrued and undistributed income from said trust fund shall be paid over to her.

"(g) We further direct that our said daughter shall receive and enjoy the income and principal from said trust estate and that such income and principal shall not be subject to alienation by her, nor shall the same ever be liable for any of her debts.

"(h) Upon the death of the survivor of us, and our said daughter having reached the age of thirty-five years, we hereby direct that one-tenth of the amount of said fund shall be paid by said trustee to our said daughter, and that thereafter, at the expiration of each interval of five years an additional one-tenth of said fund shall be paid to said daughter until five such payments have been made and said fund shall have been reduced to one-half of its original amount. The income from the remainder of said fund, and not less than $75.00 per month, shall be paid to our said daughter provided and in the event that at any time any portion of the remaining principal of said trust fund shall be needed to properly support and care for our said daughter, in the judgment of said trustee, such amount of the principal thereof shall from time to time be paid to her. Upon the death of the survivor of us and our said daughter, said trust shall terminate and said trustee shall pay over and distribute all the property belonging in said fund as follows: It shall pay the same in equal shares to heirs of the

body of our said daughter, the descendants of any child to take the share of its ancestor. And in the event our said daughter shall die without leaving any lineal descendants, the said fund shall be distributed in the same manner and to the same persons as is provided in paragraph VIII of this will for the distribution of the residuary estate of the survivor of us. The survivor of us during his lifetime, and after his death, our said daughter upon reaching her majority, may apply to the court at any time for a decree removing The First National Bank of Portland as trustee and appointing another trustee in its place, and the fact that said applicant has permanently removed his or her place of residence from the state of Oregon shall be deemed sufficient ground for granting said petition and for the appointment by the court of a non-resident bank or trust company as such trustee.

"V

"The first of us to die does hereby give, devise and bequeath all the rest, residue and remainder of his estate, both real and personal, wherever situated, to the survivor of us absolutely.

"VI

"The survivor of us does hereby give, devise and bequeath unto said The First National Bank of Portland, Oregon, as trustee, such amount, if any, as may be necessary to make up any deficiency in said trust fund above provided for, below $50,000.00, which may exist from any cause at the time of his death; that is to say, such amount, if any, as may be necessary to restore said fund to the full amount of $50,000.00, said amount so bequeathed or devised by such survivor to become a part of said trust fund and to be subject to all the terms and conditions thereof as provided.

"VII

"The survivor of us does hereby give, devise and bequeath to our daughter, Eleanor Jane Meeker, the real estate occupied as a home by the survivor

at the time of his death, together with all his household furniture, automobiles and personal effects.

## "VIII

"The survivor of us does hereby give, devise and bequeath all the rest, residue and remainder of his estate, wherever situated, as follows: one-eighth thereof to each of the following named persons: Clarence H. Corey, Everett Corey, Lloyd Corey. The lineal descendants of each of the three above-named persons to take his ancestor's share in the event said ancestor shall have died previous to the death of the survivor of us and in the event that one or more of such persons die previous to the death of the survivor of us, leaving no lineal descendants, then the survivor or survivors of the three persons above named to take the share of the one or ones so deceased:

Ethel Florey
Stella Roop
Mae Wycoff
Clara Neely
Harold Anderson

The lineal descendants of each of the above-named persons to take his ancestor's share in the event said ancestor shall have died previous to the death of the survivor of us, and in the event that one or more of such persons die previous to the death of the survivor of us, leaving no lineal descendants, then the survivor or survivors of the last five persons above named, to take the share of the one or ones so deceased.

"Provided, However, that the said Minnie C. Meeker may from time to time, by codicil to this will, executed by her in accordance with the statute, substitute other devisees and legatees for the three first above named and provide that such substituted devisees and legatees shall receive said three-eighths of said residuary estate of the survivor of us in such proportions as she may see fit, and Provided

Further, that said Clarence A. Meeker may from time to time, by codicil to this will, executed by him in accordance with the statute, substitute other devisees and legatees for the five last above named and provide that such substituted devisees and legatees shall receive said five-eighths of said residuary estate of the survivor of us in such proportions as he may see fit.

"VIII [sic]

"The first of us to die does hereby appoint the survivor and The First National Bank of Portland, Oregon, executors of this our Last Will and Testament, in the administration of the estate of such decedent to serve without bond, and the survivor of us does hereby nominate and appoint The First National Bank of Portland, Oregon, executor of this will in the administration of his estate."

It will be noted that through inadvertence each of the last two articles was identically numbered "VIII." When we hereinafter refer to "Article VIII," we will have reference only to the first of the two articles so numbered, meaning the one relating to the disposition of the surviving testator's estate.

The execution of the will was followed by a succession of events which have an important bearing upon the matter before us.

On October 17, 1941, the Meekers together executed a codicil to their will of May, 1938, which made a slight change in Article II as to the manner of distributing the legacy therein provided for Billy Corey. We will hereinafter refer to it as the first codicil. No contention arises here with reference to the change which it effected.

Mrs. Meeker died September 12, 1942. The instant will and the first codicil were admitted to probate, and Clarence Meeker and the defendant bank were duly

appointed and qualified as co-executors. Mrs. Meeker's personal estate was appraised at $35,481.49; $26,013.73 of the amount ultimately went to the establishment of the trust provided for their adopted daughter and the survivor under the terms of Article IV.

Sometime in December, 1943, Mr. Meeker married the defendant, Ruth Esther Meeker. Thereafter, on January 21, 1944, he alone executed a codicil to the joint will made by him and his former wife. So far as pertinent to our present interest, this second codicil, as we shall hereinafter call it, reads:

"By Paragraph VIII of said last will and testament it is provided that I may from time to time, by codicil to said will, substitute other devisees and legatees for the five named by me in said will, and that I may provide such substitute devisees and legatees who shall receive five-eighths of my residuary estate as I may see fit.

"I.

"Pursuant to the provisions of said will above referred to, I do hereby name as my sole legatee and devisee of five-eights [sic] (5/8ths) of my estate my wife, RUTH ESTHER MEEKER; and I hereby give, devise and bequeath to her absolutely said five-eighths of my residuary estate of which I shall die seized."

Clarence Meeker died February 28, 1948. His death was followed by a re-probate of the joint instrument and the first codicil, together with a probate of the second codicil executed on January 21, 1944. The defendant The First National Bank of Portland, Oregon, is the executor of his estate, which has not yet been closed.

It is the second codicil which provokes the necessity for construing Article VIII, it being the contention of the appellants that it was the intention of the testators

and a condition of the contract between them to make a will whereby any change in the legatees named in Article VIII could be accomplished only by a codicil executed by *both* of them; and, therefore, the second codicil executed by Mr. Meeker *alone* not only did not accomplish that intended result but worked a breach of the contract for the joint will. The legal efficacy of the second codicil is the only question before us.

Eleanor Jane Meeker was a minor at the time of the deaths of her adoptive parents, and the defendant Frank Van Dyke was appointed guardian of her person and estate. The defendants Clarence H. Corey, Everett Corey and Lloyd Corey are relatives of Minnie Meeker for whom provision is made in Article VIII. The defendant Billy Corey is the nephew of Mrs. Meeker who is named as a beneficiary in Article II and the first codicil. The defendants Mae Wycoff and Clara Neely are cousins of Mr. Meeker who, together with the plaintiffs, were named as legatees in Article VIII as that article was originally written.

It seems appropriate to here observe that the plaintiffs are the only persons named or provided for in the Meeker will of May, 1938, who express any disappointment or evidence any objection to the administration of the Meeker estates. So far as is evident to us from the record, all the other beneficiaries are satisfied with the fulfilment of the provisions made for their respective benefits.

■ A mutual will or, strictly speaking, a reciprocal will is one by which each testator makes a testamentary disposition in favor of the other. *Ankeny v. Lieuallen,* 169 Or 206, 215, 113 P2d 1113, 127 P2d 735. Properly and as exemplified by the Meeker will, it is a term employed to describe documents of a testamentary

character executed in pursuance of an agreement or arrangement between two or more persons to dispose of their property to each other or to third persons in a particular mode or manner. *McGinn et al. v. Gilroy et al.*, 178 Or 24, 39, 165 P2d 73. There are, however, cases in which the word "mutual" is used in describing wills executed in accordance with a common intention but not in the performance of any contract between them. *McGinn et al. v. Gilroy et al.*, supra. Also see *Taylor v. Wait*, 140 Or 680, 684, 14 P2d 283; *Sappingfield v. King*, 49 Or 102, 109, 89 P 142, 90 P 150, 8 LRA (NS) 1066.

■ A "joint will" is best defined as a single testamentary instrument which contains the wills of two or more persons and is executed jointly by them. 1 Page, Law of Wills (3d ed.) 220, § 102; 1 Schouler, Wills (6th ed.) 816, § 716; Thompson, Wills (3d ed.) 69, 34; 169 ALR 12.

As will be observed from the foregoing, the word "joint" goes to the form and the word "mutual" goes to the substance of what is denominated as a "joint and mutual will." Under this definition the document before us is clearly a joint and mutual will.

■ A will, although joint in the sense that it incorporates in one instrument the testamentary disposition of two or more testators, is in effect the separate will of each of the testators who executed it. *Bright v. Cox*, 147 Ga 474, 94 SE 572, 573; *American Trust & Safe Deposit Co. v. Eckhardt*, 331 Ill 261, 162 NE 843, 845; *Frazier v. Patterson*, 243 Ill 80, 90 NE 216, 217; *Hill v. Godwin*, 120 Miss 83, 81 So 790, 791; *Rastetter v. Hoenninger*, 214 NY 66, 108 NE 210, 211; 57 Am Jur, Wills, 502, § 735; 1 Schouler, Wills (6th ed.) 816, § 716; Thompson, Wills (3d ed.) 69, § 34.

The foregoing rule is more fully and clearly stated in 1 Alexander, Law of Wills, 83-4, § 69, as follows:

"In many decisions it will be found that testamentary dispositions are referred to as a joint or mutual or reciprocal will; this, however, is incorrect for no matter what the form of the will may be and although two or more persons may jointly execute a single testamentary document, the instrument is the separate will of each testator and its legal effect is separate and distinct and not joint. In this regard there can not be a joint will. Two or more persons can undoubtedly make separate wills in favor of each other or of some third party; but there is no legal objection to making the same dispositions by one document. The law does not hold it to be a single will because all the makers have subscribed the same instrument or have declared it to be their last will and testament in the presence of the same witnesses and at the same time, but views it as the separate act of each. After the death of the one first dying, the instrument may be offered and proved for probate as his will and the signatures, declarations and acts of the others, although they may be admitted in evidence as part of the *res gestae,* may be regarded as surplusage in so far as proving the will of the one deceased is concerned. The same testamentary document may thereafter, in the event it has not been revoked by a survivor, be admitted to probate as his will. The property disposed of may be joint or separate, but the declared intentions of each testator affect only his own property or his share in joint property."

■ ■ Such a joint will speaks as to each testator from the date of his death. *Ralyea v. Venners,* 280 NYS 8, 155 Misc 539; 1 Alexander, Law on Wills, 90, § 77. In fact, contrary to the contention of the appellants, there can be no such thing as a will which is joint in operation, since the joint instrument must operate severally as to each testator and be probated

as the will of each testator. *American Trust & Safe Deposit Co. v. Eckhardt,* supra; Thompson, Wills (3d ed.) 308, § 202; 169 ALR 12.

The joint will of Clarence and Minnie Meeker is not only subject to the various rules above set forth relating to wills of that character but, in our opinion, evinces a studied effort to preserve the character and integrity of their respective estates, thereby emphasizing the presence of two wills incorporated into one document. We think this is an important aid in ascertaining the testators' intentions with respect to the modifications by codicil provided for in Article VIII.

The clear intention to maintain the separate integrity and identity of the estate of each testator is manifest when we examine the will by its four corners. It is a well and carefully drawn document. As we shall see, certain things therein provided for are directed to be fulfilled only from such estate as one or the other testator owns at the time of his death.

Article I makes the respective debts and expenses of last illness and burial of each decedent a charge upon and payable "out of his estate."

Article II provides legacies for relatives of Mrs. Meeker. This article lacks all the elements of mutuality. It opens with the words, "I, said Minnie C. Meeker, do hereby give, devise and bequeath unto my father * * *" and later directs that such legacies shall be paid "as soon after my death as can be conveniently done without inconvenience to *my estate* * * *." (Italics ours.) All the directions in that article are preceded with the pronoun "I."

The provisions of Article III, giving to the survivor the household furniture, automobiles, personal effects and the home occupied by the parties, operate only upon those which are "his" at the time of the decedent's

death, precluding any thought that it impinges upon or attempts to impinge upon the ownership of anything, title to which does not stand in the name of decedent. We observe that the gift of the property described in this paragraph passes to the survivor without any limitation upon its use or future disposition. He takes it in fee, untouched and unencumbered by any of the provisions of the will which follow.

Of similar purport is Article VII, which gives to Eleanor Jane Meeker similar items of property which at the time of survivor's death are then owned by that survivor.

The touchstone of their common purpose, the apparent dominating reason for their mutual wills, is found in Articles IV and VI. These, when read together, justify the conclusion that the daughter was the one person commanding the greatest mutual solicitude of the testators. It is through these articles, and these alone, that we find the real purpose for the joint and mutual instrument which we are called upon to examine.

In Article IV we again observe the persistently recurring idea that each testator is only attempting to direct the disposition of such of his personally owned separate estate as may exist at the time of his death. Article IV opens with this sentence:

"The one of us first to die does hereby give, devise and bequeath unto the survivor and The First National Bank of Portland, Oregon, the sum of $50,000.00 in money, or in the concurring option of said trustees, in any securities *owned by such decedent at the time of his death* * * * ." (Italics ours.)

This is followed by the provisions directing that the income from such trust, when created, is to be paid to the survivor during his lifetime, with permissible inva-

sions of the corpus for the survivor's ''proper maintenance or care.'' Upon the death of the survivor, the trust continues for the benefit of Eleanor and, in the event of her death, her issue.

Article V of the instrument is the last paragraph relating to the disposition of the separate estate of the first testator to die. As to such estate, it leaves '' * * * all the rest, residue and remainder of *his estate,* both real and personal, wherever situated, to the survivor of us *absolutely.*'' (Italics ours.)

It is to Articles VI, VII and VIII that we must look to find the first evidence of obligation imposed upon the surviving testator. Up to Article VI, the will might well have been written as the separate and complete will of either Mr. or Mrs. Meeker (if we exclude Article II as to him). Up to and including Article V, it is a complete disposition of a separate estate of each party with an appropriate residuary clause.

Article VI, obligating the *surviving testator* to supplement the trust provided in Article IV with funds sufficient to bring the corpus of the trust there created to $50,000, further emphasizes the concern and solicitude for their daughter. It also bespeaks their awareness that their respective, separately owned estates might not alone be sufficient to accomplish that end. Retrospective inquiry tells us how right they were in this apprehension for, as we have seen, Minnie Meeker's estate, after being surcharged with the expenses incident to her demise and the legacies she gave to her own kin under Article II of the will, only provided slightly over 50 per cent of the initial contribution to the trust fund of $50,000 created under Article IV. This shortage in the trust brought Article VI into operation and, by the same token, left no residuary estate for distribution to her surviving husband under Article V.

Article VII carves from the surviving testator's estate a gift to Eleanor of "the real estate occupied as a home by the survivor *at the time of his death,* together with all *his* household furniture, automobiles and personal effects." (Italics ours.)

The challenged Article VIII operates only upon the *survivor's estate* and then only to the extent that there is a residue of the survivor's estate remaining after answering the mandates of the preceding paragraphs.

In no article of the will do we find the word "our" employed to describe property nor, indeed, the word "joint" nor any other word or phrase remotely suggesting that the several ownerships of the testators had been in some way reduced to a common fund in which they both claimed equal interests.

Obviously, the Meeker will has all the earmarks of two separate wills disposing of two separate estates. Moreover, this is so clearly so that had either testator voluntarily revoked the will as to himself or had it been revoked as to either by operation of law, the document could still stand unimpaired as the separate will of the other.

■■ Having referred to revocation in the foregoing paragraph, it may be well at this juncture to pause and note that during the trial and also during the course of the oral argument here, reference was made to a revocation of the will as to Mr. Meeker's estate effected by operation of law, by reason of his marriage to the defendant, Ruth Esther Meeker, after Minnie Meeker's death. § 18-301, OCLA. That such a revocation occurred is conceded by all parties. As far as we are advised, all parties also recognize the rule that a will which has been revoked by operation of law, consequent upon a subsequent marriage, is revived by republication accomplished by the execution of a codicil

thereto following the marriage. 57 Am Jur, Wills, 430, § 630. Also see *Estate of Engle*, 129 Or 77, 82, 276 P 270; *Stevens v. Myers*, 62 Or 372, 398, 121 P 434, 126 P 29. Applying these rules to the instant matter, it follows that the execution of the second codicil by Mr. Meeker worked a republication of the joint will.

Generally speaking, what we may hereinafter say concerning the revocation of a joint will refers to revocations springing from an affirmative act of one of the testators and not to revocations effected by operation of law.

It is worthy of note that the law is well established in this jurisdiction that a testator to a joint will may make a different testamentary disposition at any time and that this right applies notwithstanding that the joint and mutual will was made pursuant to contract and can even be accomplished after the decease of his cotestator. *Branchflower et al. v. Massey*, 187 Or 40, 47, 208 P2d 341; *Van Vlack et al. v. Van Vlack*, 181 Or 646, 668, 182 P2d 969, 185 P2d 575; *In re Burke's Estate*, 66 Or 252, 256, 134 P 11; 4 Page, Law of Wills (3d ed.) 833, § 1709. An essential characteristic of every will, whether a joint or individual will, is that it remains ambulatory during the testator's lifetime. 68 CJ, Wills, 602, § 223. In the Van Vlack case, we said at page 668: "* * * a contract to make a will, when based upon sufficient consideration, is irrevocable, although the will which was executed pursuant to it remains revocable." It, therefore, follows that if the revocation or modification on the part of one testator is of a character that works a breach of the terms of the original contract, any party in interest who suffers thereby has a remedy in a suit on the breached contract. *Van Vlack et al. v. Van Vlack*, supra, at page 666.

We here dwell on the powers of revocation because

they give emphasis to and are natural corollaries of the earlier discussed rules which hold that a jointly executed will is, nevertheless, the separate will of each testator who executed it and is not joint in operation. The rule relating to revocability springs from the ambulatory character of the testamentary document. We glean therefrom that the right to modify the instrument by codicil from time to time is as inherently present as is the right to revoke the will, being, as it is, a lesser manifestation of the greater power to completely void the testament of the testator, and we so hold.

Thus far we have discovered that a joint and mutual will executed by two or more testators is the separate will of each, which requires probate as such and that any one of them acting alone and independently of the other during his lifetime can revoke or modify the joint will insofar as it pertains to his separate estate, subject, however, to having his estate respond for his breach of contract if, in fact, the revocation or modification can be demonstrated to work a default in his agreement with his cotestators. Such is the law of wills so far as it applies to the instant matter. However, this being a suit predicated upon breach of contract, we are necessarily impelled to examine and give great weight to the contractual relationship of Mr. and Mrs. Meeker, even though in so doing we cannot avoid simultaneously construing the will which is our only evidence of the contractual terms, a circumstance created by the stipulation of the parties earlier referred to. Appellants' argument must necessarily bend or entirely give way in the face of this legal and practical situation.

Appellants, however, in their briefs have failed to maintain the distinctions between the essential formalities for the execution of wills and codicils by the

testators from such rights as may have been conferred upon the testators jointly or severally in their capacity as parties to the contract which induced them to make the joint will. There can be no question that such a contract may grant individual rights and powers to the parties to it. As a result, the appellants have confused the contractual elements of the will and the law relating thereto with the testamentary elements of the will and the law appropriate to testamentary disposition.

■ One item evidencing this confusion is appellants' challenge to the proper execution of the second codicil. They assert here, and for the first time, that the second codicil is ineffective and void because it was not signed by both testators to the original will, citing as authority *Montague v. Schieffelin*, 46 Or 413, 80 P 654; *Freeman v. Hart*, 61 Colo 455, 158 P 305; *In re Foster's Will*, 90 NYS2d 892; 68 CJ, Wills, 713, § 394. An examination of these authorities establishes no more than that a codicil must be executed with the same formalities as a will, i.e., signed by the testator and properly witnessed.

■ The appellants are in no position, however, to declaim against the sufficiency of the execution of the second codicil. They forget that their suit is predicated upon an alleged breach of a contract. Any issue relative to the sufficiency of the codicil's execution was properly determinable in the court of probate. On April 26, 1948, more than six months prior to the institution of this suit, the probate court found that the second codicil was executed in compliance with the statutory requirements. §§ 18-201 and 18-401, OCLA. If appellants' contention had any merit, it should have been seasonably addressed to that court after the date of the order admitting the codicil to probate. § 19-208, OCLA,

as amended by ch 185, Oregon Laws, 1945. This they did not do and are now barred. We must, therefore, accept the codicil as being statutorily sufficient as to form and as an adequate implement to modify the will it seeks to change. Appellants cannot urge technical objections to the second codicil's formal execution in a suit for breach of contract. 68 CJ, Wills, 901, § 630.

Keeping in mind that our ultimate conclusion must determine whether or not the execution of the second codicil evidences a breach of contract, we turn back to an examination of the contract between Minnie Meeker and Clarence Meeker, as the same is evidenced by the will.

█ The appellants do not contend that there was any contractual understanding between Mr. and Mrs. Meeker beyond that contained in the will. Therefore, our inquiry is necessarily confined to and bounded by the four corners of their joint and mutual will. The fact that we have to look to the will to discover the contract does not change the rule that the principles of contract law are controlling. See 4 Page, Law of Wills (3d ed.) 837, § 1710, where this rule is stated as follows:

"There seems to be no reason, if a contract to make a will is regarded as valid and not in violation of sound policy, for treating a contract to make a will as governed by principles, different, in any way, from those that apply to contracts in general; and this view seems to be that which is generally taken by most courts * * * ."

Also see 1 Schouler, Wills (6th ed.) 802, § 702; Thompson, Wills (3d ed.) 35, § 16.

█ Here the intent of the contracting parties is expressed in clear and unambiguous language, particularly in the vital Article VIII, thus relieving us of the necessity of resorting to rules of construction but im-

posing upon us the duty to give it effect according to its terms. *Pacific Finance Corp. v. Ellithorpe,* 134 Or 601, 608, 280 P 658, 289 P 1058; 17 CJS, Contracts, 683, § 294.

■ Counsel has not referred us to nor have we by our own research been able to discover any cases wherein an exact counterpart of the formula employed in Article VIII may be found, either as a testamentary provision or as a covenant in a contract for the making of a joint or mutual will. It is not novel, however, but is a device long known and used in agreements generally. Provision is frequently made in contracts for the subsequent modification thereof. *Gray v. Jones,* 47 Or 40, 81 P 813; 17 CJS, Contracts, 858, § 373; 4 Page, Contracts (2d ed.) 4405, § 2496. Such changes can be accomplished by the unilateral action of one of the parties and without notice to the other, if the contract so provides. *Manufacturers' Finance Co. v. Rockwell,* 278 Mass 502, 180 NE 224.

■ The right to contract as the parties did with reference to the provisions found in Article VIII appears to us to be well founded in law and operates without doing violence to public policy or any statutory inhibition or limitation on that right. Contracts between a husband and wife, when free of restrictions emanating from public policy or statute and when entered into in good faith, will not be set at naught. *Beach v. Holland,* 172 Or 396, 418, 142 P2d 990, 149 ALR 866.

■ Holding, as we do, that the contractual provision reflected by Article VIII is not void insofar as it relates to substance, we now turn to examine it more particularly to ascertain the intention of the parties, that is, whether in the exercise of the powers of modification contained in the provisos, it was the design of the

testators that codicils made pursuant thereto should be executed jointly or separately by the respective testators named in each proviso.

■ Because of the dual character of the instrument, i.e., as a contract and a will, we are aided by and will apply that cardinal and familiar rule which dictates that in the interpretation of wills we ascertain from the testamentary words, construed according to their natural meaning, the intent of the testator and thereafter give effect to that intent unless the same is prohibited by some positive rule of law. *In re Shepherd's Estate,* 152 Or 15, 33, 41 P2d 444, 49 P2d 448.

■■ At the outset we note that appellants' proposition that the provisos of Article VIII contemplate a mutual execution of codicils, if true, necessarily renders the provisos sheer surplusage. The right of parties to a contract to modify or amend it from time to time by mutual consent is such an accepted and recognized incident of every contract that the inclusion of a provision empowering them so to do is one of superfluity. 12 Am Jur, Contracts, 1004, § 427; 17 CJS, Contracts, 857, § 373.

Here, however, the fact that there are *two* separate provisos, each in similar language skilfully employed, indicates to us a cogent reason for concluding that the parties to the contract were not attempting to restate the existence of a right or power which they already had but rather that the provisos were made with care to expressly indicate a contrary idea or design diametrically opposed to that contended for by appellants, i.e., something negating the concept of a joint exercise of that power. The correctness of this conclusion becomes increasingly evident as we look closer to the wording and phrasing of Article VIII.

The form of Article VIII reiterates the overall pat-

tern of the testators, as seen when we examine the will by its four corners. It is a part and parcel of their mutual intention not only to make reciprocal provisions which would operate to the benefit of the survivor but at the same time give due regard to the kin of each testator. The consciousness of ownership of separate estates and the determination to insure a division of a part of their separate estates among their respective relatives are at all times apparent. The changes authorized by this article are changes which relate solely to relatives of the testators authorized to make the changes and presumptively relatives in whom the other testator had no corresponding interest. The first three legatees named are, respectively, the father and brothers of Minnie Meeker; the last five legatees (three of whom are the appellants) are cousins of Clarence Meeker.

The provisos of Article VIII are framed in identical language except for the names of the testators and appropriate pronouns. Each proviso reads in the singular. The power of substitution is reserved to Minnie Meeker by the use of phrases reading "executed by her" and "as she may see fit" and in the corresponding proviso to Mr. Meeker by the phrases reading "executed by him" and "as he may see fit." This careful phrasing is persuasive that the parties were thereby deliberately avoiding any suggestion that the codicils of substitution were to be jointly executed.

The other articles of the will are distinguished by an economy of words well chosen and the absence of superfluous or confusing phrases, all clearly setting out the testators' plan and intent. We think Article VIII is drawn with equal art and observe that had the intention of Minnie and Clarence Meeker been as claimed by the appellants, that result could have been

accomplished by their counsel with the use of approximately two-thirds fewer words than were employed. Among the simpler ways would have been to have inserted the names of Mr. Meeker's five relatives immediately following the names of Mrs. Meeker's kin, striking the word "three" wherever it appears in the first paragraph, and striking all the remaining part of Article VIII beginning with the name "Ethel Florey," as it now appears therein. True, this would destroy any reference to the right to make substitutions of legatees named in that article; but if, as the appellants so strongly urge, the right to make codicils modifying this article had to be jointly agreed upon and jointly executed, then, as we have pointed out, the assertion of that right in that form would have been surplusage for the reason that it was a right already reposing in them. As was shown by the record, the advice given to the testators by their able counsel, who was also the scrivener of the joint will, at the time they jointly and properly executed the first codicil and the advice given by him to Mr. Meeker at the time he executed the second codicil confirms in us the belief that he would have patterned the drawing of Article VIII substantially in the manner we have suggested above had not Mr. and Mrs. Meeker indicated to him their desire and intention to make such substitutions separately. It is a document which challenged the professional skill of counsel and, no doubt, was not cast into its final form until the lawyer charged with its drafting had thoroughly explored the wishes of his clients and was certain that it reflected their testamentary intention.

█ Appellants point to the words, "by codicil * * * substitute other devisees and legatees," appearing in both provisos and argue without citing any authority that the use of "devisees and legatees" in the plural

precluded Mr. Meeker from substituting one devisee and legatee, his second wife, for many devisees and legatees. In discovering the intent of parties to a contract, the courts are sometimes required to restrict the meaning of words (12 Am Jur, Contracts, 761, § 236) and to that end a word in the plural may be restricted to the singular and vice versa (*Commonwealth for Mercer County Court v. Gabbert,* 68 Ky 438, 446) but only when the plain and evident sense and meaning of the words to be derived from the context render such a construction necessary to give effect to the intention of the makers of the instrument (*Garrigus et al. v. Board of Commissioners of Parke County,* 39 Ind 66, 70).

Reading the above quoted words in terms of their context, coupled with what we conceive to be the intent of the parties, we think the use of the words ''devisees and legatees'' does not preclude a substitution of a single devisee or legatee under the powers of modification reserved to each testator or, to put it otherwise, we believe, in this instance, the greater includes the lesser. In essence, the provisos are a renunciation of any interest in the residuary estate of the last survivor to the extent of five-eighths thereof on the part of Minnie Meeker and three-eighths on the part of Clarence Meeker. To argue that Mrs. Meeker had any concern that Mr. Meeker might distribute the quantum of the residuary estate reserved to him for that purpose to any number of persons fewer than five or even fewer than two is in our opinion absurd. Neither testator could foresee what might transpire after the death of the survivor which might dictate the wisdom or necessity for the substitution of a greater or fewer number of legatees to receive that part of the whole of the survivor's residuary estate for which he or she

was authorized to substitute other legatees. Appellants give an inflexible and sacrosanct significance to the plural of "legatee" not warranted by the contract and not supported by any other evidence in the record.

The appellants assert that the words, "from time to time," appearing in both the provisos of Article VIII, do not mean "at any time" but rather mean within the lifetime of both testators. It is a construction of their own which is unsupported by citations to authorities. Apparently, there are no Oregon cases defining the precise phrase, but we find *White v. East Side Mill Co.,* 84 Or 224, 161 P 969, 164 P 736, helpful in arriving at our conclusion. There the court was called upon to give definition to the phrase "from day to day" and said, at page 230:

"* * * 'From day to day' means from one day to its succeeding day: 2 Words & Phrases (2 Series), 671. It must be held, therefore, that the court's order operated to extend the time from day number 1 to day number 2 and from that to number 3, and thenceforward, and was limited only by the provision that the time shall not be extended beyond the next term of the appellate court * * * ."

"From time to time" is, however, defined in 37 CJS 1384 as meaning: "As occasion may arise; at intervals; now and then; occasionally." One of the cases cited in support of this definition is *Upshur v. Baltimore,* 94 Md 743, 51 A 953, 955, from which we quote the following:

"These words 'to detail from time to time' are not technical words. They are the words of common speech, and as such their interpretation is within the judicial knowledge * * * . The Century Dictionary defines * * * the phrase 'from time to time' to mean 'occasionally'; and the Universal Dictionary defines 'from time to time' to mean 'at intervals; now and then' * * * ."

■ We feel warranted in holding that the phrase "from time to time" is not restrictive as to any particular period, whether measured by the joint lifetime of both testators or otherwise, and that, as used in the instant contract and will, means that either party can within the span of his lifetime make any substitution which he is authorized to make within the limitation of the proviso granting that power to him. This conclusion necessarily includes the right of either survivor to exercise such power of modification after the death of a cotestator and obviates any necessity of notice. Our definition of the phrase becomes a further item indicating the intent of the parties to the contract.

We hold that the second codicil executed by Mr. Meeker alone, wherein he nominated his then wife, Ruth Esther Meeker, as the sole legatee and devisee of five-eighths of his residuary estate, was executed pursuant to the terms of the contract for the joint will which Mr. Meeker and his wife, Minnie, signed together on May 31, 1938, and that by reason thereof the appellants are not entitled to any part of Mr. Meeker's estate under Article VIII of the joint will.

The appellants urge upon us other matters not in aid of or pertinent to the construction of Article VIII. Generally, they relate to claims that the joint will resulted in a commingling of the properties owned by the testators and that the fund thus created was impressed with a trust for the benefit of the residuary legatees of the surviving testator. By reason of the validity of the second codicil, they have no interest or claim to assert in Mr. Meeker's estate or under the contract which occasioned the original will; and, therefore, an answer to such other matters is unnecessary to this opinion and, if made, would be purely academic.

The decree of the circuit court is affirmed.