Argued and submitted December 20, affirmed December 27, 1985

ASSOCIATED OREGON VETERANS et al,
*Respondents,*

*v.*

DEPARTMENT OF VETERANS' AFFAIRS,
*Appellant.*

(CC 85-2710; CA A38080; SC S32379)

712 P2d 103

Val D. Sloper, Judge.

William F. Gary, Deputy Attorney General, Salem, argued the cause for appellant. With him on the brief were Dave

Frohnmayer, Attorney General, James E. Mountain, Jr., Solicitor General, Michael D. Reynolds, Assistant Attorney General, and Kendall M. Barnes, Assistant Attorney General, Salem.

James M. Brown, Salem, argued the cause for respondents. With him on the brief were Joseph C. Guimond and Enfield, Guimond & Brown, Salem.

Before Campbell, Presiding Justice, Carson and Jones, Justices, and Warren and Rossman, Justice pro tempore.

PER CURIAM

## PER CURIAM

The issue in this case is whether the Department of Veterans' Affairs (DVA) may unilaterally modify its lending agreements with veterans to increase monthly payments when it raises interest rates. Plaintiff borrowers[1] claim that the DVA must allow them to choose between higher monthly payments or extended amortization periods. The Marion County Circuit Court ruled for the plaintiffs. This case comes to us on certification from the Court of Appeals pursuant to ORS 19.210. Because this case involves a suit for injunctive relief, we review anew upon the record. ORS 19.125.

On November 7, 1944, the people of Oregon adopted Article XI-A of the Oregon Constitution, authorizing the state to sell bonds and use the proceeds for farm and home loans at below-market rates to qualified veterans.[2]

The 1945 legislature enacted legislation implementing Article XI-A. Oregon Laws 1945, chapter 201, created the office of Director of Veterans' Affairs. The director was given the responsibility of supervising the administration of all laws relating exclusively to war veterans. Oregon Laws 1945, chapter 403, authorized the sale of general obligation bonds with the proceeds to be deposited in the Oregon War Veterans' Fund for advances on loans to qualified veterans. The same act created a sinking fund for the payment of the principal and interest on the bonds. The sinking fund was to consist of all moneys received as payments on principal and interest on the loans, moneys derived from property tax levies authorized by the act, moneys derived from property acquired by foreclosure, earnings derived from investment of sinking fund proceeds and proceeds from the sale of refunding bonds.

From 1945 until 1969, the interest rate on veterans' loans remained fixed at 4 percent per year. In 1969, the legislature first authorized a variable rate of interest on veterans' loans. In 1971 the legislature abandoned fixed rates of interest for veterans' loans and shifted to a variable rate of interest for all loans issued after May 27, 1971, the effective date of the act. Or Laws 1971, ch 221.

---

[1] Plaintiffs are David Munz and Terry L. and Debra S. Harrison.

[2] Article XI-A and its implementing legislation were "designed to answer a perceived need for equity for returning veterans." Oregon Blue Book 1985-1986, 59.

The legislature shifted to a variable interest rate because the fixed 4 percent rate of interest would have caused a projected loss of $6 million in the next two years. In addition, the legislature intended to give the veterans' loan program flexibility so that the loan program would be self-sustaining. DVA Director H. C. Saalfeld testified before the 1971 legislature that the loan program would no longer be self-sustaining if variable rates were not allowed. Saalfeld testified: "We would also hope that it wouldn't change the monthly payment. The monthly payment would stay the same, but the term would be adjusted." Minutes, House State and Federal Affairs Committee, April 5, 1971, Tape 11, Side 1.

Between 1971 and 1979 the DVA distributed brochures to prospective borrowers that stated in part:

"The interest rate on a veteran's loan may change from time to time, according to existing economic conditions. A change in interest rate will not alter the monthly payment on the veteran's loan. Should the rate be increased, the effect would extend the term of the loan; a reduction in interest rate would cause the loan to be paid off sooner than originally scheduled. The current interest rate is 5.9 per cent on real property, and 7.9 per cent on personal-property mobile homes and leaseholds."

The DVA distributed these brochures to explain the terms of the loan.

In addition, the DVA issued a federal law "Truth in Lending" disclosure statement to prospective borrowers. This disclosure statement, regarding the stated monthly payments, provided:

"This amount is estimated for the first payment only. It is subject to change due to:

(a)   loan insurance premiums being on the principal balance of the loan and

(b)   changes in property taxes or loan insurance premium rates."

A modification clause appeared in all the mortgages, providing that:

"It is distinctly understood and agreed that this note and mortgage are subject to the provisions of Article XI-A of the

Oregon Constitution, ORS 407.010 to 407.210 and any subsequent amendments thereto and to all rules and regulations which have been issued or may hereafter be issued by the Director of Veterans' Affairs pursuant to the provisions of ORS 407.020."

In 1981, the DVA raised rates 0.3 percent and sent letters to 114,000 borrowers allowing them an option either to accept higher monthly payments or to extend the amortization period. Thirty-five thousand borrowers chose the extended amortization period. The DVA letter also stated that the borrower's mortgage would "remain at a variable rate and if future adjustments in interest rates are necessary, the corresponding adjustment in payments may be made without the option which can be extended at this time."

On May 17, 1982, the DVA adopted OAR 274-20-387, which provides:

"The Director of Veterans' Affairs may adjust payments and/or other terms of the loan under the following conditions:

(1) Tax Adjustments.

(2) A change in the interest rate and/or insurance premiums.

(3) Errors and/or omissions on the security agreement.

(4) When the balance of the loan will not amortize within the terms of the security document.

(5) Any expenditure or advance of funds as provided under ORS 407.090, ORS 407.090(2) and the security document."

In 1985, the DVA reported to the Oregon legislature that by 1999 the sinking fund would have a negative cash balance of $750 million. The DVA Director testified that:

"The financial health of the Department's farm and home loan program has gradually been deteriorating in recent years as the result of a mismatch of bond and mortgage loan maturities, a slowdown in the prepayment rate of outstanding loans, a rise in delinquencies and foreclosure losses, and insufficient earnings on our loan portfolio relative to the cost of our bonds. * * *" Minutes, Senate Business, Housing and Finance Committee (testimony of Director Mangis - April 23, 1985).

The DVA told the legislature that the impending losses would

require invoking Article XI-A, section 4, which provides for a statewide property tax with the proceeds of the tax placed in the sinking fund to repay bonded indebtedness.[3] The DVA presented a plan to avoid invoking section 4 that included an increase of one percent on existing variable rate mortgages, a corresponding increase in monthly payments and a sale of refunding bonds. The legislature responded to the DVA's plea by enacting 1985 Oregon Laws, chapter 296, authorizing the DVA to increase interest rates. ORS 407.325.[4]

Pursuant to ORS 407.325, the DVA amended OAR 274-20-341, raising interest rates one percent effective January 1, 1986. On October 21, 1985, the DVA mailed letters to borrowers advising them of the increased rate and monthly payments.

---

[3] Article XI-A, section 4, of the Oregon Constitution, provides:

"There shall be levied each year, at the same time and in the same manner that other taxes are levied, a tax upon all property in the state of Oregon not exempt from taxation, not to exceed two (2) mills on each dollar valuation, to provide for the payment of principal and interest of the bonds authorized to be issued by this article. The two (2) mills additional tax herein provided for hereby is specifically authorized and shall not be computed as a part of the revenue raised by taxation which is subject to the tax limitation of section 11, article XI of the constitution of the state of Oregon, and said tax levy hereby authorized shall be in addition to all other taxes which may be levied according to law."

In *Cross of Malta Bldg. Corp. v. Straub,* 257 Or 376, 382, 476 P2d 921, 479 P2d 505 (1971), this court stated:

"The power to levy taxes [provided by Article XI-A, section 4] was intended only as a guarantee to the bondholders that if there was a deficiency in the fund as a result of defaulting borrowers, then the deficiency could be made up by the levy of taxes. Otherwise the veterans' loan program was to be self-liquidating."

[4] ORS 407.325 provides in pertinent part:

"(1) The director, with the advice of the committee, will periodically, during the term of the loan, fix the variable interest rates to be paid by the applicant, taking into consideration the current value of the money, the solvency of the loan program, and the rates' effect on veterans. * * *

"(2) Except as provided in subsection (3) of this section:

(a) The rate of interest on loans granted on or after May 27, 1971, and originally set at five and nine-tenths percent per annum shall not be increased to more than seven and nine-tenths percent per annum.

* * * * *

"(3) The director may fix the variable interest rates to be paid by the applicant at a rate greater than the rates described in subsection (2) of this section, but only if the director determines, at the sole discretion of the director, that such action reduces the probability that invoking the provisions of section 4, Article XI-A of the Oregon Constitution will become necessary."

On November 1, 1985, plaintiffs filed a "Complaint for Declaratory, Injunctive and other relief" against the DVA alleging that the DVA (1) breached its contracts, (2) was estopped from raising monthly payments, and (3) violated the guidelines of ORS 407.325(1). On November 14, the DVA filed its Answer to the complaint. The case was tried to the circuit court judge without a jury on November 22, 1985. On December 2, 1985, additional evidence was heard and the circuit judge delivered his ruling. The circuit judge held that the DVA must give borrowers the option of raising their monthly payments or extending payment periods. We decide this case on the breach of contract issue and do not reach plaintiffs' estoppel claim. Plaintiffs abandoned their third allegation.

The breach of contract issue presented in this case is whether the DVA can, pursuant to the modification clause in the mortgages, modify the monthly payment rate specifically set forth in the mortgage note. This case involves a bilateral mortgage contract which contains terms that are ambiguous in their application. These inconsistent terms are those which provide that (1) full payment is due on or before a date certain, (2) the specified monthly payments will only change if property taxes or mortgage insurance premiums change, and (3) the interest rates may be changed. While the language used is clear, the contract is ambiguous because when the interest rates are raised, a reading of the note and mortgage does not reveal whether the amortization period will be extended or the monthly payment amount will be increased.

During argument, the Deputy Attorney General conceded on behalf of the DVA that an ambiguity existed and that the ambiguity must be resolved in favor of plaintiffs as far as the basic contract is concerned. The DVA further conceded that the terms of the brochure fixing a nonvariable monthly payment are incorporated into the contract. Deputy Attorney General Gary stated:

> "I'm prepared to concede that there was an ambiguity as to what happens when the interest rate goes up. And for purposes of our argument we assume that that ambiguity is resolved by the brochure by saying an original term of the agreement was that we would increase the term of the loan rather than the monthly payment."

"Our argument is based on the assumption that the statement in the brochure that says your monthly payment will not increase if the interest rate is increased is, by some theory or other, a part of the contract. * * *"

"Our theory assumes, for purposes of argument, that the statement in the brochure was a term in the original agreement and, therefore, there is not a question of whether that brochure modifies the agreement. It simply was an interpretation of what the agreement meant or a term in the agreement that was then subject to modification under our theory by virtue of the provisions in the agreement."

In sum, the DVA contends, even though the specific promise not to increase the monthly payment was integrated into the original note and mortgage agreement, that because the modification clause in the mortgage allows a unilateral modification of any term in the mortgage, the DVA can increase the monthly payment. The plaintiffs argue that the modification clause does not modify the promise made in the DVA brochure that, although interest rates may increase, the monthly loan payments may not be altered. Instead, the amortization period would be extended.

■    The contract provision allowing the DVA to modify terms unilaterally does not render the contract unenforceable. "The terms of a contract may be reasonably certain even though it empowers one or both parties to make a selection of terms in the course of performance." *See* Restatement (Second) Contracts 97, § 34 (1981). This court has stated that unilateral changes are permissible when the contract allows these changes. *Florey v. Meeker,* 194 Or 257, 281, 240 P2d 1177 (1952). In *Florey,* this court interpreted a contract to make a will. The contract authorized each testator to substitute legatees unilaterally by codicil. This court held that this proviso did not preclude the surviving testator from substituting a legatee after the death of the other testator. 194 Or at 287; *see also Manufacturers' Finance Co. v. Rockwell,* 278 Mass 502, 180 NE 224 (1932) (upholding a modification clause that authorized unilateral acts by one party and bound the other party without notice).

■ ■    While the DVA has the authority to modify the mortgage contracts unilaterally, any changes made by the DVA must be made in good faith and be based on fair dealing. *See* Restatement (Second) Contracts § 34, *comment b* at 98

(1981). The DVA told Oregon veterans in no uncertain words: "If you take out this loan your interest rate can vary, but your monthly payments will not increase." In good faith the DVA cannot now say: "We didn't mean what we said — now your monthly payments will go up." The most critical factor for the home loan borrowers in this case was the amount of monthly payment. The length of the mortgage was important, but not pivotal. The DVA would not be treating Oregon veterans fairly by agreeing to a specific amount for monthly payments and then turning around and nullifying that agreement by using the general terms of the modification clause.

The brochure's express statement that rising interest rates will not cause monthly payments to rise, limits the power of the DVA in changing the monthly payments. The specific language of the promise governs the general language of the modification clause. *See Boston Insurance Co. v. Carey*, 256 Or 226, 230, 471 P2d 782 (1970); *Waterway Terminals v. P.S. Lord*, 242 Or 1, 22-23, 406 P2d 556 (1965); *Rayburn v. Crawford*, 187 Or 386, 396, 211 P2d 483 (1949). When a broad general clause and a limited specific clause are inconsistent, "the latter should generally be held to operate as a modification." 256 Or at 230 (citing 3 Corbin on Contracts 176, § 547 (1960)).

But does the DVA have some sort of super power, beyond that of an ordinary person to modify its contracts? The DVA claims that even in the absence of an express modification clause, it had the "reserved" power to modify the contract, if such modification advanced the public interest. The Department relies on United States Supreme Court cases[5] and one Oregon case, *Wilkinson v. Carpenter*, 277 Or 557, 561 P2d 607 (1977), which interpreted Article I, section 10, of the federal constitution, the Contracts Clause, which prohibits the states from making laws "impairing the obligation of contracts." These cases analyze the Contracts Clause in relation to the Tenth Amendment which provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." When *Wilkinson*

---

[5] The DVA relied principally on *Home Bldg. Loan Ass'n v. Blaisdell*, 290 US 398, 54 S Ct 231, 78 L Ed 413 (1934), and *El Paso v. Simmons*, 379 US 497, 85 S Ct 577, 13 L Ed 2d 446 (1965).

acknowledges the "reserved power of the state to [pass legislation, in that case to raise statutory homestead exemptions] for the protection and welfare of its people," 277 Or at 565, it is interpreting the Tenth Amendment.

■ This court has not held that a state agency possesses "reserved" or "inherent" power to modify contracts to which it is a party whenever, in the opinion of its responsible officials, such modification will further the interests of the citizenry. We decline to do so here. Whatever reserved power exists lies in the state, that is, the legislature, and the people. We are not here faced with a statutory amendment requiring higher monthly payments or an initiated statutory or constitutional amendment with the same effect. The only question is whether a state agency, possessing only those powers delegated to it, has sweeping power to modify express provisions of its own contracts, in contravention of the understanding of the contracting parties. We hold that it does not.

We conclude that the DVA may enforce its increased interest rate, but may not do so by unilaterally increasing a veteran's monthly mortgage payment.[6] The circuit court is affirmed.

---

[6] In November 1979 the DVA brochure was changed to eliminate the agreement that should the interest rate be increased the effect would extend the term of the loan and not alter the monthly payment on the veteran's loan. Therefore, any loan issued after November 1979 is subject to an increase in the monthly payment. (This is so, irrespective of any action taken by a veteran in response to the DVA option offered in 1981.)